**STARK et al. v. BRANNAN.**

Civ. No. 12944.

United States District Court

District of Columbia.

Feb. 24, 1949.

Edward B Hanify, of Boston, Mass., Harry Polikoff, of New York City, and Edgar J. Goodrich, of Washington, D. C., for plaintiffs.

George Morris Fay, U. S. Atty. and Mary Connor Myers, of Dept. of Agriculture, both of Washington, D. C., for defendant.

William E. Leahy, of Washington, D. C., and Seward A. Miller, of New York City, for Dairymen's League Cooperative Ass'n, Inc., intervening defendant.

HOLTZOFF, District Judge.

This is an action brought by several dairy farmers against the Secretary of Agriculture, to enjoin the enforcement of a section of an Order regulating the handling of milk in the Greater Boston marketing area. The challenged provision directs the deduction of certain sums of money from the producers' settlement fund and the payment of such deductions to cooperative associations. The plaintiffs claim that there is no basis in law for this preferential scheme. The sole question presented for the determination of this court is whether this provision is authorized by statute.

The Order in question was issued by the Secretary of Agriculture under the provisions of the Agricultural Adjustment Act of 1937, Act of June 3, 1937, 50 Stat. 246, 7 U.S.C.A. § 601 et seq. Among other things, the statute empowered the Secretary of Agriculture to issue orders governing persons engaged in the handling of agricultural commodities, 7 U.S.C.A. § 608c. In the case of milk and its products, it was provided that Orders of the Secretary should contain one or more of the terms and conditions enumerated in the statute and no others, Sec. 608c(5). In brief, the terms and conditions permitted by the Act related to classification of milk, minimum prices, time of payment, payment of uniform prices to producers, and payment for certain services to producers, except as to those for whom the services were rendered by a cooperative marketing association.

The prices to be paid by handlers and the prices to be paid to producers were to be subject only to adjustments for factors expressly enumerated by the statute.

In addition, the statute provided that all Orders relating to agricultural commodities might contain one or more terms or conditions therein enumerated. None of these are material in this action except the last, which authorized the inclusion of terms: "(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order." Sec. 608c(7).

Pursuant to statutory authority, the Secretary of Agriculture, on July 28, 1941, issued an Order regulating the handling of milk in the Greater Boston marketing area. This Order was amended on August 1, 1947. The provisions to which the plaintiffs object are found both in the original and in the amended Order. In substance the Orders, insofar as material, may be summarized as follows.

All milk sold by dairy farmers is divided into two classes: Class I, milk sold for use as fluid milk; and Class II, milk sold for use for other purposes, such as manufacture of butter and cheese. Customarily for economic reasons, the two classes of milk are sold at different prices. The Orders created an equalization plan whereby every dairy farmer (generally known as "producer") receives a proportionate share of the total proceeds of all milk sold in the marketing area, irrespective of whether his milk is used by the purchaser as Class I or Class II milk. The device by which this object is accomplished is known as the "blended price". The Orders provide for fixing minimum prices for Class I and Class II milk to be paid by the distributors, who purchase from the farmers and who are generally known as "handlers". Each handler pays for the milk that he receives. The Market Administrator, however, computes, on the basis of the minimum prices, the value of all milk sold in the area each month and, after making certain adjustments prescribed by the Orders, calculates a weighted average price, or "blended price", as it is called. Each producer is paid on the basis of the blended price, sub-ject again to certain adjustments. The Orders establish machinery whereby each handler makes partial advance payments to his supplier, while final settlements are later made with the Administrator. Before the blended price is computed, however, the Administrator is required to make a deduction prescribed by the Orders and to pay the amount so deducted to those producers that are cooperative associations of dairymen. No similar payment is made to other producers.

The plaintiffs are producers who are not members of any cooperative association. They dispute the legality of the provision for this deduction and payment to cooperative associations. They contend that this direction exceeds the Secretary's statutory authority and results in an unlawful diminution of the proceeds ultimately paid to them. They bring this suit as a class action to secure an injunction against the enforcement of this provision and for an adjudication that it is invalid.

In limine the question is raised as to the right of the plaintiffs to bring this suit. It will be disposed of before entering on a discussion of the merits. The Supreme Court has already ruled in this action that on the allegations of the complaint, these plaintiffs, being milk producers who have an interest in the common fund, may maintain a class action in order to restrain the Secretary of Agriculture against what they deem to be an unlawful diversion of a part of the money. Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733.

It is now urged by the defendant and by the intervenor that actually the interest of the plaintiffs in the disputed payments is comparatively small and amounts possibly to a few hundred dollars. Moreover, it is contended that, in fact, the expenses of the litigation are borne principally, if not entirely, by other persons. It is argued that these circumstances disqualify the plaintiffs from maintaining this action. It would be a dangerous doctrine, however, that would preclude a person from seeking to vindicate his civil rights by a judicial proceeding merely because the encroachment of which he complains is but slight. It would be equally unsound to bar a person from recourse to a judicial remedy

merely because the expenses incurred by him in the litigation are advanced or borne by some one else. For example, were this the rule, many a matter involving civil rights could not have been brought before the courts, in cases in which some organization is championing the rights of some poor person. Clearly, the law does not close the portals of the courts to a litigant who receives financial assistance from another person in bearing the expenses of the suit.

It is also contended that the plaintiffs may not maintain this action as a class suit, on the ground that they do not adequately represent the group.[1] This contention is not entirely without merit. It is not necessary to pass on it, however, in view of the fact that the plaintiffs have a right to bring this action in their individual capacity without necessarily denominating it as a class suit. This is not a case in which plaintiffs seek an adjudication of their respective interests in a common fund. It is merely an action to restrain an alleged misapplication of a part of the money. Any person having an interest in the fund may maintain such a suit as an individual. If, therefore, this action does not lie as a class suit, it may be treated as an action by the plaintiffs in their individual capacities. From the foregoing considerations, the conclusion inescapably follows that these plaintiffs may maintain this action. This result brings us to a consideration of the merits.

The Agricultural Marketing Act confers broad powers and wide discretion on the Secretary of Agriculture. The courts may not interfere with the exercise of this authority, irrespective of whether they agree with the expediency or desirability of the Secretary's action. This principle is inherent in the tripartite division of the Federal Government. The Secretary's authority, however, is not unlimited and his discretion is not untrammeled. He must act within the confines and the orbit of the statute. If he transcends these boundaries and promulgates an order that is not authorized by law, the courts have a duty to step in, if the matter is properly presented to them in a justiciable case or controversy.

The statute carefully and meticulously enumerates the exact types of provisions that may be contained in a marketing order. The Act expressly adds that the Secretary may include no others. In explicitly defining the adjustments that the Secretary may make in computing the price to be paid to producers, the statute again expressly provides that the price shall be subject only to the enumerated adjustments. Nowhere does the statute contain any provision authorizing the Secretary to make a deduction from the equalization pool to be paid to cooperative associations.

Agricultural cooperative organizations are properly considered a highly desirable and beneficent development in the economic life of the nation. For this reason they have long been a favorite of the Congress.[2] No doubt the Congress, if it chose to do so, might have granted subsidies to them out of public moneys. Conceivably, it might possibly have provided that subventions should be paid to them out of the common fund created under the Milk Orders. The Congress has, however, done neither. An officer of the Executive branch of the Government, by an administrative order, has directed that out of the pool belonging in equity to all of the milk producers, a certain amount should be deducted and paid to cooperative associations, thus depriving the remaining producers of a portion of the money that would otherwise be paid to them. Obviously, no matter how well intended, or even how desirable his action might be, an Executive officer of the Government may not overstep the statutory limitations on his authority. He may not take the property of one person and give it to another.

The defendant and the Dairymen's League Cooperative Association, which has intervened as a defendant, seek to sustain the provision under attack by reliance on the provision of the statute which authorizes the Secretary to include in the marketing Order provisions incidental to and not

---

[1] See, e. g. Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84.

[2] See, e. g., 7 U.S.C.A. § 291; 7 U.S.C.A. § 610(b) (1); 12 U.S.C.A. § 1141e; 26 U.S.C.A. § 101(12).

inconsistent with the terms and conditions specified in the statute and necessary to effectuate the other provisions of the Order. Sec. 608c(7). The word "incidental" means minor, auxiliary, or subordinate to a principal or primary subject. A thing incidental to an express provision is dependent or ancillary to it. The term does not comprehend something additional to and independent of the principal subject matter. It relates solely to matters of a subordinate nature inherently forming a part and parcel of the main topic.

Thus, in First National Bank v. Missouri, 263 U.S. 640, 659, 44 S.Ct. 213, 216, 68 L.Ed. 486, the Court stated: " * * * an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted."

In that case, the Supreme Court held that a statute, 12 U.S.C.A. § 24, vesting national banks with "all such incidental powers as shall be necessary to carry on the business of banking", did not confer the authority to operate branch banks.

In The Robin Goodfellow, D.C., 20 F.2d 924, 925, the court stated: " 'Incidental,' obviously, means depending upon or appertaining to something else as primary."

In Biggart v. Lewis, 183 Cal. 660, 668, 192 P. 437, 440, the court defined "incidental", as "having reference to something which is subordinate to and dependent upon and follows the existence of another and principal thing."

Standard Steel Works Co. v. Williams, 155 Ga. 177, 183, 116 S.E. 636, holds to the same effect.

A provision for making substantial deductions from the equalization pool and paying them to cooperative associations, can hardly be construed as incidental to the other parts of the Orders. It is entirely independent and is of major importance. Moreover, the provision can hardly be said to be "not inconsistent" with the terms and conditions expressly specified in the stat-

ute. The statute provides that the price shall be subject to adjustments only for enumerated factors. There is no provision for an adjustment by way of a deduction in favor of cooperative associations. Finally, it cannot be properly said that the challenged provision is necessary to effectuate the other provisions of the Order. For all of these reasons, the provision assailed by the plaintiffs cannot be justified under this clause of the statute.

 Finally, the Government and the intervenor seek to invoke the canon of statutory construction that administrative interpretation of a statute should be given great weight in determining its meaning. This principle no doubt exists, but is inapplicable in the instant case, for two reasons. First, the doctrine has its principal usefulness in situations involving a continuous uniform administrative construction of a statute over a considerable period.[3] Here there has been a single construction resulting in the promulgation of several orders, all within a comparatively short time. Second, this rule should not be applied to an administrative construction involving the administrator's own powers. Surely it would be a strange doctrine that would permit an administrative officer to extend his own powers in doubtful cases by his own interpretation of the statute. It would be a clear case of lifting oneself by one's own bootstraps.

In Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U.S. 479, 510, 17 S.Ct. 896, 904, 42 L.Ed. 243, the Supreme Court held that the Commission lacked the power to fix railroad rates, although the Commission had construed the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., as conferring this authority. Mr. Justice Brewer made the following pertinent observations: "Still again, it is urged that the commission has decided that it possesses this power, and has acted upon such decision, and an appeal is made to the rule of contemporaneous construction. But it would be strange if an administrative body could by any mere process of construction

[3] Smiley v. Holm, 285 U.S. 355, 369, 52 S.Ct. 397, 76 L.Ed. 795; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175; United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322.

create for itself a power which congress had not given to it."

The legislative history throws an illuminating light upon the question involved here. In 1940, the Senate Committee on Agriculture and Forrestry recommended that the statute be amended by explicitly providing specific authority for the payment of compensation to cooperatives out of any pool or funds.[4] The hearings indicate that the additional legislation was requested by the Secretary of Agriculture. This amendment was not enacted by the Congress. It seems clear that the Secretary must have had some doubt as to his power in this matter. Else he would not have asked for supplemental legislation expressly conferring such authority. Nevertheless, in 1941 the Order was issued with the questioned provision found in it.

The foregoing discussion leads the Court to the conclusion that in including the challenged provision in his marketing Orders, the Secretary exceeded his statutory authority and that consequently the provision should be adjudged illegal and void and its enforcement should be restrained.

Judgment for the plaintiffs. Counsel will present proposed findings of fact and conclusions of law and a proposed judgment.

---

[4] S.Rept.No. 1719, 79th Cong., dated May 29, 1940, pp. 7, 8.