BRANNAN, SECRETARY OF AGRICULTURE, *v.*
STARK ET AL.

NO. 6.

Argued October 9, 1951.—Decided March 3, 1952.

*Neil Brooks* argued the cause for the Secretary of Agriculture. With him on the brief were *Solicitor General Perlman* and *W. Carroll Hunter.*

*Seward A. Miller, Frederic P. Lee* and *Maurice A. Gellis* submitted on brief for the Dairymen's League Co-operative Association, Inc.

*Edward B. Hanify* argued the cause for respondents. With him on the brief were *Harry Polikoff* and *Lipman Redman.*

*Reuben Hall* and *Waldo Noyes* filed a brief for the New England Milk Producers' Association et al., as *amici curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This action by dairy farmers, nonmembers of cooperative associations, concerns 1941 amendments to an order of the Secretary of Agriculture dealing with the marketing of milk in the Boston area. It was previously here as *Stark* v. *Wickard,* 321 U. S. 288 (1944), where it was held that the respondents had such an interest in the Order as to give them legal standing to object to those of its provisions here under attack. Upon remand the provisions were held invalid by the District Court, 82 F. Supp. 614, and that decision was affirmed in the Court of Appeals for the District of Columbia Circuit. 87 U. S. App.

D. C. 388, 185 F. 2d 871. We granted certiorari. 341 U. S. 908.

The question now presented is whether those amendments to the Order which provide for certain payments to cooperative associations are within the authority granted the Secretary by the Agricultural Marketing Agreement Act of 1937.[1] The respondents seek to enjoin the enforcement of the provisions in question.

The purpose of the Act and the nature of the Secretary's Order No. 4 thereunder [2] are set out in some detail in *Stark* v. *Wickard, supra,* at 291–302. It is here sufficient to note the following aspects of Order No. 4, as amended: In the Order, issued pursuant to the Act, the Secretary divided all milk marketed in the Greater Boston area into Class I, which is sold as fluid milk, and Class II, which is used for other purposes such as the manufacture of butter and cheese. The Order provides for the fixing of minimum prices to be paid by handlers for each of these classes of milk. Each handler pays for milk in accordance with the amount of each class he has purchased. Producers, however, are paid the same price for milk delivered no matter what use is made of the particular milk by the handler. The Market Administrator computes, on the basis of prices paid by handlers, the value of all milk sold in the area each month. After making certain adjustments, he divides that value, as adjusted, by the total quantity of milk sold in the area during the month, to determine the "blended price," which is the price actually paid the producer. One adjustment made in determining the blended price is

---

[1] 50 Stat. 246, as amended, 7 U. S. C. § 601 *et seq.* The Act of 1937 reenacted and amended provisions of the Agricultural Adjustment Act of 1933, 48 Stat. 31, as amended.

[2] 7 CFR §§ 904.1–904.110.

the deduction providing for the disputed payments to cooperatives.[3] This deduction is thus "a burden on every area sale." *Stark* v. *Wickard, supra,* at 303. "Apparently, [it] is the only deduction that is an unrecoverable charge against the producers. The other items deducted under [the Order] are for a revolving fund or to meet differentials in price because of location, seasonal delivery, *et cetera.*" *Id.,* at 301. The effect of the deduction and the correlative payments to cooperatives is to reduce the amount which producers, such as respondents, who are not members of cooperatives would otherwise receive for their milk, and to increase corre-

---

[3] Section 904.8 (b) of the Order requires the Market Administrator, in computing the blended price, to deduct, among other items, the total amount of cooperative payments required by § 904.10 (b), which provides:

"(b) *Cooperative payments.* On or before the 25th day after the end of each month, each qualified association shall be entitled to receive a cooperative payment from the funds provided by handlers' payments to the market administrator pursuant to § 904.9. The payment shall be made under the conditions and at the rates specified in this paragraph, and shall be subject to verification of the receipts and other items upon which such payment is based.

"(1) Each qualified association shall be entitled to payment at the rate of 1 cent per hundredweight on the milk which its producer members deliver to the plant of a handler other than a qualified association; except on milk delivered by a producer who is also a member of another qualified association, and on milk delivered to a handler who fails to make applicable payments pursuant to § 904.9 (b) (2) and § 904.11 within 10 days after the end of the month in which he is required to do so. If the handler is required by paragraph (e) of this section to make deductions from members of the association at a rate lower than 1 cent per hundredweight, the payment pursuant to this subparagraph shall be at such lower rate.

"(2) Each qualified association shall be entitled to payment at the rate of 2 cents per hundredweight on milk received from producers at a plant operated by that association." 7 CFR § 904.10 (b).

spondingly the receipts of cooperatives.[4] We must determine whether the Secretary was authorized by the statute to include the provisions requiring this deduction and these payments in the Order. No question is presented as to the adequacy of the evidence to support the findings of the Secretary, but rather, a question as to the power granted the Secretary by Congress.

The disputed provisions were introduced into the Boston Order in 1941, after hearings called by the Secretary. Affidavits, filed by representatives of the Secretary in support of his motion for summary judgment in the District Court, show the following: A major issue at the hearings was the amount of a uniform allowance, previously 26¢ per hundredweight, which was reflected in the price paid by all handlers for Class II milk.[5] This allowance resulted in a lower price to handlers for Class II milk than for Class I milk. It was intended to defray the cost of handling surplus milk. There was a considerable variance in milk plant costs which was thought to make continuance of a uniform rate undesirable. Cooperative plants showed higher costs than those of proprietary handlers. That difference was attributable not only to the cooperatives' maintenance of a reserve supply to meet irregular demands of proprietary handlers for Class I milk, but also to overcapitalization and excess capacity which had existed prior to any federal regulation. To meet these higher costs cooperatives proposed a lower uniform allowance for Class II milk, coupled with

---

[4] The total amount thus paid cooperatives in the Boston area since 1941 is $1,521;028; in addition, more than $400,000 has been deposited in a special account to await the final result of this litigation. However, the payments to cooperatives have in each year constituted no more than a fraction of one percent of the total value of milk marketed in the area.

[5] See, e. g., R. 60, 70–75.

a payment to cooperatives only for market services, although they had engaged in the activities claimed to constitute market services for years without any such payment. In the amendments resulting from the hearings, the uniform allowance to handlers was reduced from 26¢ to 21½¢, while at the same time the provisions here contested, requiring payments to cooperatives alone, were introduced.

Section 8c (5) of the Act provides that orders relating to milk and its products shall contain one or more of certain enumerated terms and conditions, *"and* (except as provided in subsection (7)) *no others"* (emphasis added).[6] It is paragraph (D) of subsection (7) upon which the

---

[6] § 8c (5), note 1, *supra:*

"(5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: *Provided,* That, except in the case of orders covering milk products only, such provision is approved or favored by at least three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period;

Secretary relies. That paragraph authorizes provisions "incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such

the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by· this section; or

(ii) for the payment to all producers and associations of producers delivering milk to. all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk ·delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by ·any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of ·milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection (5), providing a method for making· adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof.

"(D) Providing that, in the case of all milk purchased by handlers from any producer who did not regularly sell milk during a period of 30 days next preceding the effective date of such order for consumption in the area covered thereby, payments to such producer, for the period beginning with the first regular delivery by such producer and continuing ʻuntil the end of two full calendar months following the first day of the next succeeding calendar month, shall be made at the price for the lowest use classification specified in such order, subject to the adjustments specified in paragraph (B) of this subsection (5).

"(E) Providing (i) except as to producers for whom such services are being· rendered by a cooperative marketing association, qualified as provided ·in paragraph (F) of this subsection (5), for market information to producers and for the verification of weights, sam-

order." [7] The provisions here in question are not specifically authorized by any part of the Act. Both courts below thought these provisions to be neither incidental nor necessary, and to be inconsistent with terms specified in the named subsections.[8]

The payments to the cooperative associations are said to be justified as remuneration for services performed for the market by the associations. To qualify for the pay-

pling, and testing of milk purchased from producers, and for making appropriate deductions therefor from payments to producers, and (ii) for assurance of, and security for, the payment by handlers for milk purchased.

"(F) Nothing contained in this subsection (5) is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions of the Act of Congress of February 18, 1922, as amended, known as the 'Capper-Volstead Act', engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers: *Provided,* That it shall not sell milk or its products to any handler for use or consumption in any market at prices less than the prices fixed pursuant to paragraph (A) of this subsection (5) for such milk.

"(G) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

[7] § 8c (7) (D), note 1, *supra.* Subsection 7 authorizes certain general terms for all marketing orders, including both those relating to milk and its products and those relating to other commodities. The terms thus authorized, aside from paragraph (D), prohibit unfair competition, provide for filing of sales prices by handlers, and provide for selection of an agency to implement the order.

[8] 82 F. Supp. 614, 618; 87 U. S. App. D. C. 388, 397–399, 185 F. 2d 871, 880–882.

ments, an association must meet eight requirements listed in the Order.[9] But none of these shows any indication that the activity it prescribes will benefit nonmembers, with the possible exception of the seventh, which requires

---

[9] 7 CFR § 904.10 (a):

"(a) *Application and qualification for cooperative payments.* Any cooperative association of producers duly organized under the laws of any state may apply to the Secretary for a determination that it is qualified to receive cooperative payments in accordance with the provisions of this section. Upon notice of the filing of such an application, the market administrator shall set aside for each month, from the funds provided by handlers' payments to the market administrator pursuant to § 904.9, such amount as he estimates is ample to make payment to the applicant, and hold it in reserve until the Secretary has ruled upon the application. The applicant association shall be considered to be a qualified association entitled to receive such payments from the date fixed by the Secretary, if he determines that it meets all of the following requirements.

"(1) It conforms to the requirements relating to character of organization, voting, dividend payments, and dealing in products of nonmembers, which are set forth in the Capper-Volstead Act and in the state laws under which the association is organized.

"(2) It operates as a responsible producer-controlled marketing association exercising full authority in the sale of the milk of its members.

"(3) It systematically checks the weights and tests of milk which its members deliver to plants not operated by the association.

"(4) It guarantees payment to its members for milk delivered to plants not operated by the association.

"(5) It maintains, either individually or together with other qualified associations, a competent staff for dealing with marketing problems and for providing information to its members.

"(6) It constantly maintains close working relationships with its members.

"(7) It collaborates with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers.

"(8) It is in compliance with all applicable provisions of this subpart."

that the association collaborate "with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers." [10] Even if this requirement comprehends a service to nonmember producers substantial enough to be significant in determining the validity of a mandatory contribution from them to cooperatives, it does not support the exaction in issue, which concededly is based mainly upon other services primarily performed for members.

Indeed, those "services" which the Secretary principally urges as justifying the payments do not appear among the expressed prerequisites for the payments. Chief among the activities claimed to benefit all producers are those which tend to maintain an adequate supply of fluid milk at all times and to dispose of surplus supply. A principal source of the problems of milk marketing is the seasonal character of milk production. Herds sufficient to meet the demand for fluid milk during the winter months produce much more than enough to satisfy that demand during the summer months. It is contended that the cooperative associations handle a proportionately larger share of surplus milk than other handlers. It appears that they engage in the manufacture of milk products as a means of absorbing the surplus, and otherwise aid in obviating the "dumping" of surplus and discouraging the reduction of herds to a point below that necessary to supply the demand in the season of low production. It may be conceded that these activities are indirectly beneficial to the whole market, even though they are engaged in for the direct advantage of members only. However, proprietary handlers also carry on activities of this kind, and their plants handle two-thirds as much surplus

---

[10] *Ibid.*

milk as do those of the cooperatives.[11]   Prior to amendment of the Order in 1941, the cost of handling surplus milk was recognized in the uniform 26¢ allowance to all handlers of Class II milk, but only cooperative associations now receive the payments in issue here.   It is clear that the associations are in no way required to handle any of the surplus milk of nonmembers.   More significant, there is no requirement in the Order that the associations take any action directed toward solution of the problem, even with respect to surplus milk of their members.[12]

Other "services" of the cooperatives which are claimed to be beneficial to all producers are, as they affect the issue here, relatively insignificant.   These activities are, like the others, primarily designed for the advantage of mem-

---

[11] In 1939 (no later statistics are available in the record), there were 21 plants in the Boston area which were equipped for manufacturing milk powder, condensed milk or butter, of which 13 were cooperative and 8 proprietary.   The cooperative plants handled 60.2 percent of the surplus milk that year.   R. 66 and 68.

[12] Contrast the New York Order, providing for comparable payments, at various rates, to cooperatives.   That Order expressly requires that an association, to qualify for any such payments, must arrange for and supply "in times of short supply, Class I milk to the marketing area," and must secure "utilization of milk, in times of long supply, in a manner to assure the greatest possible return to all producers."   7 CFR, 1950 Cum. Supp., § 927.9 (f).   To receive the highest rate of payments under that Order, in certain circumstances a cooperative must "in addition to the other qualifications . . . [be] determined by the Secretary to have sufficient plant capacity to receive all the milk of producers who are members and to be willing and able to receive milk from producers not members."   Id., at § 927.9 (f) (3).   As proposed at one point in the hearings, the Boston Order would have contained requirements like those of the New York Order.   R. 233.   Their omission in the Order, as finally issued, presumably was deliberate.   In fact, the Secretary admits that many of the cooperatives in the Boston area were unwilling or unable to perform services such as those required by the New York Order.   R. 24–25 and 70.

bers, although they may sometimes incidentally benefit the whole market. They generally amount to no more than playing the part of an alert, intelligent, organized participant in the market. They include such functions as employing economists to study the needs of the industry, participating in hearings on orders such as that involved here, being attentive to changing factors in the market, and maintaining the cooperative organizations by promotional work to show farmers the benefits of cooperation and by educational work among members. One may observe some incongruity in requiring some producers to pay others for vigorously prosecuting their own interests, especially where their interests may sometimes conflict with those of the producers burdened with the payments.

In these circumstances, we cannot say that the disputed provisions fall within the authority granted by the catch-all phrases of § 8c (7) (D) of the Act. We note at the outset that § 8c (5) states in specific and lengthy detail the provisions which may be included in milk marketing orders. That subsection lays down comprehensive directions for classification, pricing, and the operation of the equalization pool mechanism, particularly as to adjustments and deductions employed in determining the blended price. But § 8c (5) does not authorize the provisions challenged here. Section 8c (7) authorizes a congeries of general terms which may be included in all marketing orders, including those dealing with commodities other than milk and milk products. The Secretary claims authority for the provisions in question is given by the last paragraph of this omnibus subsection, a paragraph authorizing the inclusion of auxiliary provisions "incidental to . . . the terms and conditions specified in subsections (5), (6), and (7)." [13] Yet it is claimed that the

---

[13] § 8c (7) (D), note 1, *supra.* Subsection (6) has no application to orders dealing with milk.

contested provisions are of such basic importance that their validity may be crucial to the success of the whole milk marketing program. We do not think it likely that Congress, in fashioning this intricate marketing order machinery, would thus hang one of the main gears on the tail pipe. The conclusion that these provisions are not "incidental" to the specified terms is further supported by the presence of § 8c (5)(E), expressly authorizing deductions from payments to producers for other, specified services, and indicating the likelihood of similar specific authorization for the contested deductions if Congress intended that they should be made. Finally, the provisions cannot be incidental to the enumerated terms and conditions since they are inconsistent therewith.

The payments to cooperatives are inconsistent with § 8c (5)(A), which provides that all handlers shall pay uniform prices for each class of milk, subject to certain adjustments of no concern here. The discriminatory effect of the payments becomes the more evident when they are considered in context with the reduction in the uniform allowance to all handlers on the price of Class II milk. That reduction was simultaneous with the establishment of the system of payments to be made to cooperatives only and to be funded by deductions from prices paid all producers. The result would have been substantially similar if the allowance to proprietary handlers had been reduced while the allowance to cooperatives had been permitted to remain at its previous higher level. Such a lack of uniformity in prices paid by handlers would clearly have contravened § 8c (5)(A).

The deduction for payments to cooperatives is inconsistent with § 8c (5)(B), which requires the payment of uniform prices to all producers for all milk delivered, subject to certain adjustments not here pertinent. It has been contended that the deduction does not affect the uniform price of milk, but represents only a reimbursement for services. The argument seems to be that all

producers receive a uniform price while the deduction merely constitutes a charge to all producers for services, a charge which happens to be paid certain associations of producers because those associations perform the services. The fact remains that the receipts of nonmembers resulting from delivery of a given quantity of milk are smaller than those of the associations and their members. This is true because nonmembers are paid only the blended price while members receive, through their associations, the disputed payments in addition to the blended price. Although made to members collectively, these payments necessarily redound to members individually. Thus, if they are used to pay the costs of the associations, they reduce *pro tanto* the contributions which are required from individual members. But we need not go further than to hold that the argument cannot negate inconsistency with the uniform price requirement where, as here, the services for which the payment is made are performed for the direct benefit of the cooperatives' memberships, are but incidentally helpful to other producers, and are not a required condition to receipt of the payments.

Since the provisions for payments to cooperatives are not incidental to § 8c (5) and (7), but are inconsistent with the former subsection, we need not determine whether they are "necessary to effectuate the other provisions"[14] of the Order, the third requirement of § 8c (7)(D).

When the directly relevant provisions of the Act thus demonstrate lack of authority for the payments to cooperatives, no power to require them can be implied from the general instruction of § 10 (b)(1) to the Secretary, directing him to accord "recognition and encouragement" to cooperative associations.[15]

---

[14] § 8c (7) (D), note 1, *supra.*

[15] § 10 (b) (1), note 1, *supra.*

Without support in the words of the statute the challenged provisions must fall, for neither legislative history nor administrative construction offers any cogent reasons for a contrary result. Available indicia of congressional intent at the time of enactment lend weight to the contention that specific provision would have been made for this kind of payments to cooperatives if they were meant to be made.[16] Attempted amendment later to provide authorization for the payments, and the accompanying discussion in Congress, are, as a whole, indecisive.[17] Approval of the payments by Congress cannot be inferred from its ratification, upon passage of the Agricultural Marketing Agreement Act in 1937, of marketing orders previously issued under the Agricultural Adjustment Act.[18] Even if we were to accept the proposition that

---

[16] The statutory provisions setting forth the terms which might be included in marketing orders were first enacted in an amendment to the Agricultural Adjustment Act in 1935. 49 Stat. 753. This enactment occurred shortly after the decisions of this Court in *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935), and *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935), placing limitations on the delegation of rule-making authority to administrative agencies. With these cases specifically in mind, Congress set forth with deliberate particularity and completeness the terms which the Secretary might include in marketing orders. H. R. Rep. No. 1241, 74th Cong., 1st Sess. 8; S. Rep. No. 1011, 74th Cong., 1st Sess. 8.

[17] S. 3426, 76th Cong., 3d Sess.; S. Rep. No. 1719, 76th Cong., 3d Sess. S. 3426 would have clearly authorized payments such as those challenged here. It passed the Senate, but went no further. As to the inconclusive nature of the Bill and its history, see the opinion of the Court of Appeals, 87 U. S. App. D. C. 388, 400, 185 F. 2d 871, 883.

[18] "Nothing in this Act shall be construed as invalidating any marketing agreement, license, or order, or any regulation relating to, or any provision of, or any act of the Secretary of Agriculture in connection with, any such agreement, license, or order which has been executed, issued, approved, or done under the Agricultural Adjustment Act, or any amendment thereof, but such marketing agreements, licenses, orders, regulations, provisions, and acts are hereby expressly ratified, legalized, and confirmed." 50 Stat. 246, 249

Congress there intended to confer statutory authority for all future provisions like any of those then existing in any marketing order, we would reach the same conclusion because neither the provisions for these particular payments nor any closely analogous provisions were at that time present in any marketing orders. Nor have provisions bearing substantial similarity to those before us since been included in other orders so frequently as to amount to a consistent administrative interpretation of import in construing the Act.[19] Many provisions for payments to cooperatives appearing in other orders have been of a kind specifically authorized by the statute. Thus, the provision of the first Boston Milk Order for a price differential as between cooperative milk and noncooperative milk was upheld in *Green Valley Creamery* v. *United States*,[20] as a "market differential" authorized by § 8c (5)(A)(1).

We have no occasion to judge the equity or the wisdom of the payments to cooperatives involved in this case. We hold that they are not authorized by the Act.

*Affirmed.*

MR. JUSTICE JACKSON and MR. JUSTICE MINTON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE REED and MR. JUSTICE DOUGLAS concur, dissenting.

I dissent and would sustain the provisions of the Secretary of Agriculture's Boston milk order which the majority here invalidates. Those provisions require that cooperatives be reimbursed for a part of the cost they incur in performing services which the Secretary and the

---

[19] Of thirty-nine currently outstanding milk marketing orders, only four contain provisions of the general nature of those in question. One of these is the Boston Order involved here; another is the New York Order, as to which see note 12, *supra*.

[20] 108 F. 2d 342, 345 (C. A. 1st Cir., 1939).

Court of Appeals have found benefit all dairy farmers in the Boston market area. Two or three sentences, or clauses in them, of today's majority opinion avow that the Court invalidates the payment provisions solely on the ground that the Secretary is without statutory authority to include them in his order. The remainder of the Court's opinion is not at all limited to an attempt to justify an exclusively statutory holding. For despite the clause at the end of the Court's opinion that it does not "judge the equity or the wisdom of the payments," nearly all of its 15 pages are devoted to a studied effort to leave the impression that the payments are unfair handouts, gratuities, or subsidies to inefficiently operated cooperatives. It seems appropriate, therefore, to explain at the very outset the true nature of these payments and the consequences of outlawing them.

In general the Secretary's order fixes prices and regulates distribution of milk in the Greater Boston area. Under this marketing system the purchase price of all milk sold by farmers in the area is paid into a collective fund or pool. After deduction of legally authorized amounts it is the duty of the Government's market administrator to distribute the fund so that all contributing farmers will receive so far as possible equal amounts for equal quantities of milk of the same quality. The difficulty of achieving this uniformity of price as between cooperative and non-cooperative farmers is complicated by many factors. Non-member farmers receive direct payment for their milk from this market pool fund. But highly material here is the fact that the pool funds are not distributed to farm cooperative association members but instead are paid directly to the associations of which they are members. These associations then deduct certain expenses before distributing the balance to their member farmers. Many of these expenses are incurred by the association in performing beneficial market-wide

services which bring about higher milk prices for all farmers. Fund payments to non-cooperative farmers, however, are subject to no such association deductions. The result is that farmer members of cooperatives may get less for their milk than non-members. See *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 579, 580. In this way non-members can get a free ride paid for by cooperating farmers; the latter have always objected to this, regarding it as a dog-in-the-manger attitude and an unfair market practice. Before the Government stepped into the milk picture, the cooperating farmers used strong coercive measures to compel non-cooperatives to help pay a fair share of cooperative costs in rendering market-wide services. And from the beginning of government regulation in the 1930's the Government has adopted measures to insure that non-member farmers pay for the benefits they receive.

The provisions here nullified prescribe a legal and peaceful method to require non-cooperative farmers to pay their fair share of market costs, thereby preventing the recurrence of the kind of violent strife with which this country became all too familiar before the present national farm policy was adopted. The provisions have been a part of the Boston order since 1941—eleven years. In accordance with them more than one and a half million dollars have been paid to cooperatives.[1] If illegally received, I suppose the money is illegally held. Whether these farmer associations can survive the Pandora's box of lawsuits this case is likely to turn loose is anybody's guess. Perhaps most dairy farmers in New England would not of their own accord file suits against the cooperatives, for the record indicates an overwhelming farmer support for the market order including these challenged

---

[1] In addition, about $400,000 has been paid into court under an impounding order entered by the District Court in 1949.

provisions.[2] In fact, the five farmers whose names appear as challengers of these provisions are not the persons most interested in sabotaging the Boston milk order. Expenses of this litigation, already more than $25,000 by 1949, have been borne by milk handlers. These handlers have no financial interest in the fund and did not even have standing to bring this suit in their own name. *United States* v. *Rock Royal Co-op., supra,* 561. The attitude of these private proprietors in this and past attacks on cooperatives justifies a rather strong inference that cooperatives will continue to be defendants in lawsuits pushed by well-financed adversaries.

It may be suggested that despite possible floods of litigation, the cooperatives can be saved from complete bankruptcy by statutes of limitations, judicially created defenses, finespun legal or verbal distinctions, or even by emergency congressional legislation. But if some might happen to befriend cooperatives in the future, the blow today inflicted is hardly calculated to make cooperatives very enthusiastic about performing the important functions in the market program that Congress wanted them to.[3] Moreover, these particular New England associations are not the only ones placed in imminent jeopardy

---

[2] In 1941 farmers in the Boston milk area were given an opportunity to express their approval or disapproval of the order. They voted as follows:

|  | *For* | *Against* |
|---|---|---|
| Cooperating farmers | 11,587 | 0 |
| Non-member farmers | 694 | 61 |
| Total vote | 12,281 | 61 |

[3] "The Secretary, in the administration of this title, shall accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution." 49 Stat. 750, 767.

by today's holding. As the majority opinion points out, cooperative associations in other areas have been receiving payments for market-wide services under similar market orders of the Secretary. Under such provisions millions of dollars have been received by these other cooperatives. They too have little if any chance to escape harassment from the swarm of lawsuits this case invites.[4]

Congress intended cooperatives to be what they actually have been—the backbone of the farm market system and the dynamo which makes the system function. Without them, many think that program would have been a flop; with their help comparative peace has now come to an industry that in the twenties and early thirties was divided into fighting factions engaging in bitter warfare and bloodshed on the nation's highways. Regardless of the consequences, however, the majority's body blow to cooperatives would be justified if required by congressional command. But Congress has expressed its desire precisely to the contrary. This is shown, I believe beyond all doubt, by the language, history, background and administration of the marketing laws.

I feel deeply that the Court's action in this case checkmates the congressional will, unjustifiably inflicts a grievous wrong on cooperatives, and plays havoc with a national farm policy that is working peacefully and well. The judiciary should not cavalierly throw a monkey wrench into its machinery.

---

[4] The majority apparently desires to leave an inference that some of the other orders might survive legal challenges. I cannot believe that the majority is today sustaining these other orders not now here against attacks on grounds not yet argued. In each market area the services for which cooperatives are paid are of the same nature. Any difference in language used by the Secretary in formulating the orders is of no real significance, and I do not believe any crucial distinctions could possibly be drawn between the various orders except by arbitrary fiat.

*History, Background, and Administration of the Act.*— An inherent problem of the milk industry is that cows produce more milk at some seasons of the year than at others. This means a seasonal excess of supply over demand which can result in disastrous price cutting in an uncontrolled market. In an attempt to avoid the harmful consequences of price cutting farmers combined in cooperative associations which agreed to find a market for all the milk their members produced. Through the channel of collective bargaining, they were able to obtain better prices and a wider market for fluid milk. With the surplusage that still remained, they turned to the manufacture of cheese, butter, and other by-products, even though their manufacturing plants were forced to remain idle during the seasons of no surplusage. Congress itself recognized the inherent value of these cooperative organizations, and with a view to helping farmers improve their market position, it passed the Capper-Volstead Act in 1922 [5] and the Agricultural Marketing Act of 1929. [6]

These Acts treated cooperative associations as useful governmental instrumentalities to achieve congressional agricultural policies. With such help cooperatives made progress, although in every market area there were some producers who refused to join. These non-member producers, without paying anything for it, nevertheless received direct advantages from the work of the cooperatives in raising milk prices, diverting surplusage, and

---

[5] 42 Stat. 388, 7 U. S. C. § 291. This Act gave special consideration and exemptions to cooperative associations of farmers.

[6] 46 Stat. 11, 12 U. S. C. § 1141. A declared policy of this Act was to encourage the organization and operation of farmer cooperative associations. The Act also provided for making loans to cooperatives, to aid them in taking care of the surplus crops, and to assist the cooperatives in educating the producers of farm products in the advantages of cooperative marketing.

improving general market conditions. This produced deep resentment on the part of cooperative-producers which resulted in bitter strife and unrest.[7]

Thus, an acute agricultural problem has long been one of devising means whereby each producer would pay his fair share of the cost of rendering needed market-wide services. Prior to passage of the Agricultural Adjustment Act of 1933, the cooperatives themselves used their bargaining power to meet the situation. A 1929 contract between the cooperative association and handlers (purchasers of milk from producers) in the Chicago marketing area illustrates the methods used.[8] All handlers were required to agree not to purchase milk from non-member producers unless the latter agreed to a certain deduction. This deduction was equal to that the handlers were required to make in the case of milk purchased from member-producers. In both instances the deduction was paid by the handlers to the cooperative to defray its expense incurred for the services. This procedure insured that no producer of milk received benefits without paying something for them.

The Agricultural Adjustment Act of 1933 empowered the Secretary of Agriculture to regulate the milk industry by a system of licensing and marketing agreements. In the licenses issued under this Act, the Secretary included various provisions relating to payments to cooperatives for the rendition of marketing services. Some licenses contained provisions similar to those of the Chicago contract of 1929.[9] Others contained provisions which required

---

[7] See *Nebbia* v. *New York*, 291 U. S. 502.

[8] See H. R. Doc. No. 451, 74th Cong., 2d Sess. 47–48.

[9] See, *e. g.*, Twin City (St. Paul and Minneapolis) Area Milk License No. 5, Ex. A, Arts. II and III, issued August 29, 1933 and terminated February 16, 1934; and License No. 32, Ex. A, § II, issued February 12, 1934 and terminated April 18, 1944.

all producers who did not belong to cooperative associations to pay "service charges" to organizations created by order of the Secretary.[10] These organizations rendered the same services which cooperatives did and charged the same for them. Thus all producers were required to pay their share for market services, either directly to a producer-owned association or to an association sponsored by the Secretary to force non-members to pay their part.

In 1935 Congress amended the Agricultural Adjustment Act to provide for market regulation by means of orders. The first Boston milk order was issued under § 8 (b) of that Act as amended. That order required the payment of a higher price per hundredweight for cooperative milk than for non-cooperative milk. This was based on the Secretary's finding that "the differential in prices to associations of producers, and producers, is justified as a reasonable allowance for services actually performed by associations of producers." *Green Valley Creamery* v. *United States,* 108 F. 2d 342, 345. This differential which remained in the order from the date it was issued in 1936 until 1941 was held valid by the Court of Appeals for the First Circuit in *Green Valley Creamery* v. *United States,* supra. See also *United States* v. *Rock Royal Co-op.,* 307 U. S. 533, 562, 565. From 1941 to the present the Secretary's Boston order has contained the kind of cooperative payment provisions now in issue, and treated by the majority as a gratuity.

In summary, before 1933 cooperative associations forced payments for their services by exertion of collective

---

[10] See, *e. g.,* Baltimore Production Area Milk License No. 6, Art. III, § 5, issued September 25, 1933. Detroit Milk Shed Milk License No. 4, Art. III, § 4, issued August 23, 1933. Evansville, Indiana, Milk Shed License No. 12, Art. III, § 4, issued October 19, 1933. Philadelphia Milk Shed License No. 3, Art. III, App. I, § 4, issued August 21, 1933.

strength. After passage of the Agricultural Adjustment Act of 1933 licenses issued under it up to 1935 compelled such payments. Congress amended the Act in 1935. Committee Reports show that orders of the Secretary issued under the Amendment should "follow the methods employed by cooperative associations of producers prior to the enactment of the Agricultural Adjustment Act and the provisions of licenses issued" between 1933 and 1935.[11] The same Committee Report in explaining why the Secretary should recognize and encourage cooperative associations "to promote efficient methods of marketing and distribution" said: "it has been found from experience that the participation by . . . associations of producers has been of material value in administering" the agricultural program.[12] The 1937 Amendment to the Act went still further and "expressly ratified, legalized, and confirmed" all "marketing agreements, licenses, orders, regulations, provisions, and acts" of the Secretary of Agriculture issued under the former Act. 50 Stat. 246, 249. Some of the orders and licenses thus expressly ratified by Congress contained the provisions requiring nonmembers to pay for collective market services. And a Committee Report on this 1937 legislation referred to the Act's marketing program as "valuable supplements to the cooperative efforts of producers, particularly in the case of fruits, vegetables, and milk."[13] Finally, in 1948 Congress again manifested its approval of the Secretary's program which at that time included the very cooperative payments now at issue.[14]

---

[11] H. R. Rep. No. 1241, 74th Cong., 1st Sess. 9.

[12] *Supra*, p. 13.

[13] H. R. Rep. No. 468, 75th Cong., 1st Sess. 2.

[14] "Any program in effect under the Agricultural Adjustment Act, as reenacted and amended by this Act, on the effective date of section 302 of the Agricultural Act of 1948 shall continue in effect with-

The Court brushes aside the foregoing history and invalidates the cooperative payment provisions. Its asserted reason for doing so is that statutory authority for the payments is lacking. We are left in the dark as to whether the Secretary lacks all authority to make payments to any and all persons, or has authority to pay everybody else except cooperatives, or has authority to pay everybody else except New England cooperatives. The Court's opinion leads me to believe that its real basis for invalidation is a belief that:

(1) The payments are a mere gratuity, a subsidy to inefficiently operated cooperatives.[15]

(2) The Secretary's order properly construed does not require cooperatives to perform market-wide services; therefore they should be paid nothing, regardless of the fact that they actually performed such services for the past eleven years.

(3) It is evil and illegal to pay cooperatives for working to benefit a whole group of which they are a part.

*First.* If these payments were mere gratuities as the District Court held and as intimated by the majority, I too would hold them illegal. However, they cannot be considered gratuities because administrative findings of fact and the whole record show precisely the contrary. I cannot agree that it is for this Court to redetermine facts found by the Secretary after at least three exhaus-

---

out the necessity for any amendatory action relative to such program, but any such program shall be continued in operation by the Secretary of Agriculture only to establish and maintain such orderly marketing conditions as will tend to effectuate the declared purpose set out in section 2 or 8c (18) of the Agricultural Adjustment Act, as reenacted and amended by this Act." Act of July 3, 1948, 62 Stat. 1247, 1258, 7 U. S. C. (Supp. IV) § 672 (b).

[15] This appears to have been the view of the District Court. 82 F. Supp. 614.

tive public hearings [16]—findings which were not even challenged by the parties. The administrative history of the Marketing Act shows conclusively that at the time of the first of these hearings in 1941 the right of cooperatives to receive payments for market-wide services was well established. From the evidence before the Secretary at this first hearing he concluded that the payments to cooperatives were justified and would tend to effectuate the purposes of the Act. 6 Fed. Reg. 3762, 7 CFR, 1941. Supp., § 904.0. In 1943 another public hearing was held at which an unsuccessful attempt was made to eliminate cooperative payment provisions from the order. One of the findings resulting from this hearing is as follows:

"The present plan of payments to cooperatives, which became effective August 1, 1941, was based on the consideration that to achieve the benefits to all producers which the order is designed to provide two types of activity by producers' cooperative marketing organizations are desirable: (1) presentation of evidence at hearings concerning the needs of producers with respect to prices for milk and differentials to reflect handling costs to furnish an adequate basis for constructive amendments to the order, and (2) assumption of responsibility for a reserve of milk to meet the irregular needs of distributors which is essential in a market which provides market-wide equalization among all producers of the total value of the milk. . . . From these considerations it was

---

[16] Public hearings were held in 1940, 1941, 1942, 1943 and 1947. The 1940 and 1941 hearing records are before us as an exhibit. The other hearing records are available; all the findings resulting from all these hearings have been published in the Federal Register as the law requires. And if the evidence before the Secretary were not available, his findings would carry a presumption of a state of facts justifying his action. *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 567–568.

> concluded that provision for payments to cooperative associations is considered necessary to equitably apportion the total value of milk among producers. The testimony in support of the proposal to completely eliminate this feature of the order does not show that these considerations were substantially erroneous." 9 Fed. Reg. 3057, 3059.

In 1947 still another unsuccessful attempt was made to eliminate these provisions. At this public hearing the Secretary expressly reaffirmed the prior crucial findings on which the order rests. 12 Fed. Reg. 4921, 4928. It is the provisions of this 1947 order now held invalid.

There was an abundance of evidence to support the Secretary's findings that the cooperatives in the Boston area were equipped to and did constantly provide substantial services to help sustain the market price of milk and to stabilize its distribution. Evidence showed that New England cooperatives maintained expensive manufacturing equipment to take care of surplus milk; that most of the surplus milk was concentrated in cooperative plants and that even proprietary handlers normally depended on cooperatives in time of short production. There was testimony that all these activities imposed huge financial burdens on cooperative associations and that unless non-members were made to bear part of these large costs, cooperating farmers, who saved the market from the chaos of a fluctuating milk supply, would actually get less net amounts for their milk than did the non-members who merely reaped the harvest sown by others.

The foregoing suggests but a very minor part of the evidence on which the Secretary found that the cooperative payment provisions were consistent with the Act's terms and necessary to effectuate the order's other provisions designed to maintain a smoothly functioning market. The Court of Appeals agreed with the Secretary as to the value of cooperative services. 87 U. S. App.

D. C. 388, 392, 399, 185 F. 2d 871, 875, 882. Its opinion not only conceded that "there was substantial evidence that these services were rendered" but emphatically declared "There is no doubt that these services are pronounced aids to all participants in the marketing area—producers, handlers and consumers." In fact the Court of Appeals rather impatiently rejected the "gratuity" theory of the payments by declaring that the record made the market-wide aid of cooperatives "so clear that it serves no purpose to describe the helpful effects in detail." This Court now resurrects this rejected theory by implying that the cooperative payments are mere gifts, thereby upsetting the Secretary's findings while asserting that it is indulging in pure statutory construction.[17] This, of course, is the safest way to upset findings supported as these are by substantial evidence.

*Second.* The majority seems to imply that even if the cooperatives do render valuable market-wide services they ought not to be paid. This is because the Court, reading the order with punctilious nicety, finds that it lacks words expressly compelling cooperatives to render the precise services for which they are paid. I fail to see why cooperatives should not be paid for work they actually do, but in any event I read the order as requiring that those services be performed.

---

[17] The majority disclaims any challenge to the adequacy of the evidence to support the Secretary's findings. In the succeeding paragraph the majority resorts to affidavits filed in the trial court in an attempt to show that the purpose of these payment provisions was to subsidize inefficient and overcapitalized cooperative plants. The Secretary had found the payments were bona fide compensation for work performed. Thus the Secretary found one fact; the Court relies on a court affidavit to find a contrary fact. I think the affidavit does not support this Court's finding. Moreover, the administrative findings should be tested by evidence the administrator heard, not by *de novo* proceedings in a reviewing court.

The public hearings held in connection with this order resulted in findings that cooperatives should be paid for rendering two broad types of market services. Most importantly, they were to be paid for the "assumption of responsibility for a reserve of milk to meet the irregular needs of distributors." 9 Fed. Reg. 3059. Section 904.10 (b)(2) of the order specifies the amounts to be paid cooperatives for meeting this responsibility. This section by its very terms requires that before they get their pay cooperatives must meet their responsibility by running plants which sell or process milk. It does so in the following language: "Each qualified association shall be entitled to payment at the rate of 2 cents per hundredweight on milk received from producers at a plant operated by that association." Neither the New York order nor any other order could possibly contain a more compelling requirement for the cooperatives to perform these market services than does this order—namely, no work, no pay.[18]

Section 904.10 (b)(1) specifies the amounts to be paid cooperatives for their work in bringing about better milk prices for all farmers. This is the second broad type of service which the Secretary found cooperatives should be paid for. In order to be entitled to receive any payment whatsoever for this service, a cooperative must not only comply with the provisions of the Capper-Volstead Act, but also must "collaborate(s) with similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers."[19] If a cooperative does the things required by the Capper-Volstead Act and the last-mentioned section of the order, it is bound to be working to bring about better milk prices for all dairy farmers in the area.

[18] See n. 4, supra.
[19] 7 CFR, 1947 Supp., § 904.10 (a)(1)(7).

After public hearing, the administrator of this Act has found on three separate occasions that cooperatives expended their time and money in performing these market-wide services. I am not sure why the majority forbids the payments. I hope it is not on the theory that the Secretary's supposed lack of linguistic skill must deprive cooperatives of pay for the work they did during the past eleven years. Whether this is the theory, one cannot be sure.

*Third.* The majority states that there is somewhat of an "incongruity" in allowing cooperatives to be paid for "vigorously prosecuting their own interests," leaving the inference that there is something inherently evil and illegal in such payments. I do not see why. It seems more incongruous and wrong to me to let non-members get something for nothing and at the sole expense of the cooperating farmers. There is certainly no conflict of interest among farmers in connection with the obtaining of a higher price for the milk of all. The payments were made to achieve this end. Furthermore, I doubt if the majority would want to hold that Congress is barred from taking advantage of the belief of many that government regulation can be most effective where the fullest possible use is made of the aid and helpful services of those who are being regulated. I find it impossible to believe that Congress intended to compel the Secretary to hire more regular, all-time government employees to perform, and in many instances to duplicate, work that could be best and perhaps least irritatingly performed by farmer-owned and farmer-controlled associations.[20] To the contrary,

---

[20] However, the contrary view of the Court of Appeals appears to have been a basis for its invalidation of the order for it said:

"It is argued that it would take a decided increase in the present staff of the administrator to provide these services and that such increase would be expensive. This is no answer. The Act makes it the duty of the administrator to do this. He cannot farm out these duties to

the controlling law expressly directs the Secretary to use cooperatives where he can.[21]  That it is evil for the Secretary to pay cooperatives for market services seems an unduly fastidious concept.[22]

Finally, I do not agree with the majority that statutory authority for these payments is lacking.  The Act first authorizes the Secretary to take certain specified actions designed to set up a well-functioning government-controlled milk-market system.  To avoid the inevitable rigidity of its expressly defined authorizations Congress went further and authorized the Secretary to provide for additional market mechanisms "Incidental to, and not inconsistent with, the terms and conditions specified . . . and necessary to effectuate the other provisions of such order." 49 Stat. 750, 757, 7 U. S. C. § 608c (7)(D). The key words in this section, referred to by the Court of Appeals as "the measuring standard," are "incidental," "not inconsistent," and "necessary."  Largely relying on

---

one class of producers at the expense of another class, for this would violate the effect of uniformity of price required in subsections 608c (5) (B) (i) and (ii) and be 'inconsistent' therewith." 185 F. 2d 871, 881.

[21] See n. 3, *supra*.

[22] I have not discussed above a fourth ground upon which the Court may possibly rely for its holding.  There seems to be a certain flavor in the majority opinion to the effect that cooperatives should not be paid for maintaining surplus milk reserves since corresponding payments are not made to proprietary milk handlers.  However, this must be mere coloration, for the record shows, by the testimony of the proprietary interests themselves, that they will not work to dispose of surplus milk at the high price which only fluid milk brings because they are unwilling to deal with their competitors.  If the proprietary interests should decide to cooperate with their competitors in the future so that all farmers can receive higher prices for their milk, the Secretary and the farmers will no doubt be glad to pay them for doing so.  At any rate, I do not believe the majority is proceeding on the assumption that because one group has been wronged, the Court must insure that all other groups must be similarly wronged.

their selections of abstract word definitions, the District Court and the Court of Appeals held that the Secretary's order was forbidden by each of these key words. This Court clearly agrees that the order for payment is not "incidental" and is "inconsistent" with the Act's terms. However, it meticulously avoids any reliance on the word "necessary."

. A. *Necessary.*—The Secretary concluded that cooperative payments were "necessary" to effectuate the other terms of his order. An overwhelming majority of the farmers affected by the payment provision voted in favor of them. The administrative history of the Act shows that the payments have made a substantial contribution to the smooth operation of the Government's program. Congress itself has ratified these very provisions now in issue. All of this is enough for me; I would hold that the provisions are "necessary" within the meaning of the Act.

B. *Incidental.*—The majority holds that these payments are not "incidental" to the other terms of the order. This holding seems to be based on the idea that the payment provisions are too important to be merely "incidental." [23] This idea is in marked contrast to the Court's previous statement that "the payments to cooperatives have in each year constituted no more than a fraction of one percent of the total value of milk marketed in the area." I do not doubt that these payments are of considerable importance in carrying out the basic market control system set up by the Act. But I deny that they are such independent ends in themselves that they are

---

[23] The majority also states that these payments cannot be "incidental" because they are "inconsistent" with other provisions of the Act. Maybe these two words are synonyms, but I had not thought so. At any rate I shall later state reasons why these payments are wholly consistent with the Act and the market program set up under it.

something more than an "incidental" part of the program
they were designed to serve. Clearly the payment pro-
visions are auxiliary to the main purpose of the Act and
its market system. Consequently, the Court refuses to
give that "considerable flexibility" which we have previ-
ously said the Secretary should have "to include provi-
sions auxiliary to those definitely specified." *United
States* v. *Rock Royal Co-op., supra,* at 575, 576.

C. *Inconsistent.*—The Court's holding that the coop-
erative payments are "inconsistent" with the Act is based
on the notion that the order destroys uniformity of prices
received by cooperative members and non-members to
the detriment of non-members. The Court's holding in
this regard rests in part on its unsupported and unsup-
portable findings that "receipts of nonmembers resulting
from delivery of a given quantity of milk are smaller than
those of the associations and their members. This is true
because nonmembers are paid only the blended price
while members receive, through their associations, the dis-
puted payments in addition to the blended price." The
crucial error of these assumptions or findings of fact,
whichever they are, is the Court's assertion that coopera-
tive service payments "redound to members individually."
There is not only an absence of evidence to support this
assertion, but it is contrary to the known facts of the way
cooperatives work. The only possible support for such an
extraordinary inference is by a renewed adoption of the
theory that these payments are gratuities, a theory the
Court of Appeals emphatically rejected. But this record
actually shows that it costs the cooperatives more to per-
form the services than they are paid. It also shows that
cooperatives are compelled to deduct the complete cost of
these services long before the member farmers are paid
for their milk. The result is that but for these payments
the cooperative members are bound to get less than the
blended price for their milk while non-members get the

blended price. The very reason the Secretary authorized these payments was to insure so far as possible that nonmembers should not get more for their milk than cooperating farmers do. It is therefore the Court's action today, not the Secretary's order, that prevents uniformity of price in the Boston area.

In striking down these provisions of the Secretary's order, the Court has departed from many principles it has previously announced in connection with its supervision over administrative agents. Under these principles, the Court would refrain from setting aside administrative findings of fact when supported by substantial evidence; [24] we would give weight to the interpretation of a statute by its administrators; [25] when administrators have interpreted broad statutory terms, such as here involved, we would recognize that it is our duty to accept this interpretation even though it was not "the only reasonable one" or the one "we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n* v. *Aragon,* 329 U. S. 143, 153. Only a short while ago in a Labor Board case this Court said: "Not only are the findings of the Board conclusive with respect to questions of fact in this field when supported by substantial evidence on the record as a whole, but the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight." *Labor Board* v. *Denver Bldg. Council,* 341 U. S. 675, 691, 692. True, this was said with reference to a Labor Board case under the Taft-Hartley Act, but findings and interpretations of the Secretary of Agriculture should stand on no lower level.

I dissent.

---

[24] See *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474.

[25] *Gray* v. *Powell,* 314 U. S. 402.