**FITCHETT BROS., INC., Plaintiff,**

v.

**Orville FREEMAN, Secretary of Agriculture of the United States, Defendant.**

United States District Court
S. D. New York.

May 3, 1965.

182

Harry Polikoff, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for the United States.

Patricia A. Garfinkel, Asst. U. S. Atty., Harland F. Leathers, Irwin Goldbloom, Attys., U. S. Dept. of Justice, Joseph A. Walsh, Atty. U. S. Dept. of Agriculture, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This is a statutory action pursuant to Sec. 8c(15) (B) of the Agricultural Marketing Agreement Act of 1937 as amended (the Act), 7 U.S.C. § 608c(15) (B), to review a decision and order of the judicial officer of the Department of Agriculture acting for the Secretary of Agriculture. The decision and order under review involve the interpretation and application of a compensatory payment provision, ¶ (b) (1) of § 927.83 of Milk Market Order No. 27,[1] promulgated by the Secretary under the Act (7 U.S.C. § 601 et seq.), which regulates the handling of milk in the New York-New Jersey marketing area.

In Crowley's Milk Co. v. Brannan, 198 F.2d 861, 862 (2 Cir. 1952), Judge Clark said "It is now no secret that governmental regulation of the distribution of milk is complex and mystifying." The subject has not grown any less so since that time.

The general scheme of federal milk regulation, compensatory payment provisions thereunder and their purpose and effect, is described in detail in Lehigh Valley Co-op Farmers, Inc. v. United States, 370 U.S. 76, 78–91, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962). See generally United States v. Rock Royal Co-op, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); Kass v. Brannan, 196 F.2d 791 (2 Cir.), cert. den. 344 U S. 891, 73 S.Ct. 210, 97 L.Ed. 689 (1952). The specific problem in the case at bar will be discussed against that background.

The Lehigh case held that paragraphs (b) (2), (b) (3) and (b) (4) of § 927.83 of Marketing Order No. 27, the order involved here, were invalid as inconsistent with the policy expressed by Congress in § 8c(5) (G) of the Act under which Order 27 was issued by the Secretary. The case at bar involves paragraph (b) (1) of § 927.83 of the Order which was not passed upon in the Lehigh case. The issue here is different from that in Lehigh and involves the application rather than the validity of paragraph (b) (1).

Plaintiff Fitchett is a milk distributor with a processing plant at Poughkeepsie, New York, in the New York-New Jersey marketing area covered by Marketing Order No. 27. Fitchett purchased quan-

1. Effective January 1, 1962 Order No. 27, 7 C.F.R. § 927, was renumbered Order No. 2, 7 C.F.R. § 1002, but will be referred to here by its original number. During the period involved in this case and thereafter Order No. 27 was amended from time to time. The amendments, however, did not affect the controversy here. To avoid confusion and for convenience, references to Order 27 are to the order in the language quoted by the judicial officer in his decision which sets forth the Order in the form effective March 1, 1960. A copy of Order 27 in pamphlet form is part of the file in this case.

tities of milk from suppliers in the Connecticut milk marketing area who were not covered by Order No. 27 but by the Connecticut Marketing Order No. 119.[2]

The present controversy concerns the amount which the market administrator determined was owing by Fitchett to the so-called Producer Settlement Fund because of these purchases from Connecticut sources. The Producer Settlement Fund is one of the mechanisms by which the price of milk in the New York-New Jersey marketing area is regulated.

Specifically, Fitchett's complaint is that a "direct delivery differential" of $.10 per cwt. was included by the administrator in calculating the value of the Connecticut milk purchased, which calculation in turn was used in arriving at the amount owing by Fitchett to the Producer Settlement Fund. The inclusion of the $.10 per cwt. differential increased the amount owing by Fitchett to the Settlement Fund to that extent. The administrator proceeded on the theory that the inclusion of the direct delivery differential was authorized by paragraph (b) (1) of § 927.83 of Order 27. Fitchett contends that such inclusion was not so authorized and was improper.

Fitchett filed a petition with the Secretary challenging this action of the administrator. Hearings on the petition were held before a hearing examiner who made findings and conclusions and recommended dismissal of the petition. Exceptions to the hearing examiner's report were filed with the judicial officer of the Department who denied the relief requested and dismissed the petition. This action for review followed.

Both parties have moved for judgment under Rule 12(c), F.R.Civ.P., on the pleadings and on the certified record. There are no issues of fact and the case can be decided on the pleadings and the record of the proceedings under review.

*The mechanisms of price regulation under Marketing Order 27.*

Before proceeding to a discussion of the specific problem presented a brief description of the price regulatory scheme provided in Order 27 is necessary.

Speaking in broad terms, the primary purpose of the scheme of regulation in Order 27 is to enable dairy farmers to receive a minimal price for their milk. To accomplish this the order employs two different categories of price calculation. One is a "class price" based on the value of the milk to the wholesaler or processor in terms of the end use to which it is put. The other is a "uniform price" to be paid directly to most dairy farmers for milk delivered to processors or wholesalers.

Under § 927.7 of the Order Fitchett is a milk processor who is denominated as a "handler". Fitchett's plant is classified as a "pool plant" under § 927.9. Fitchett, as a handler operating a pool plant is subject to the regulatory provisions of Order 27.

Handlers purchase milk either from "producers", as defined in Order No. 27, or from other suppliers who are not so defined. Under § 927.6 producers include dairy farmers within the New York marketing area whose milk is delivered direct from farm to a handler's pool plant. In general all milk delivered by producers to a pool plant is considered as "pool milk," —that is to say, part of the pool of milk regulated by Order 27.

1. Class or minimum price: Under §§ 927.30 through 927.37 of Order No. 27 milk acquired by a handler from a producer is classified according to its ultimate use. There are three general classes of utilization. For example, milk of specified butterfat content used for fluid consumption is in Class I while milk used for various manufactured food products is in Class III. Each classification of milk is assigned monthly a "minimum" or "class" price computed according to complex formulae set out in

2. Effective January 1, 1962, Connecticut Order No. 119 was renumbered Order

No. 15, 7 C.F.R. § 1015, but will be referred to here by its original number.

§ 927.40. Among other things, the formulae reflect a variety of economic factors and take into account the volume of milk received from producers which falls into the various use classifications. Also included in the calculations are so-called butterfat differentials, transportation differentials reflecting hauling costs of milk to centers of consumption, and other specified differentials.

The class prices so arrived at are used (a) in calculating the uniform price to be paid by handlers to producers, and (b) to determine the obligations of handlers to a so-called Producers Settlement Fund designed to offset differences between the value to handlers of milk in terms of its ultimate use and the uniform price at which it must be purchased.

2. "Uniform price": The uniform price required to be paid by a handler to a producer for milk received at the handler's plant, regardless of classification, is determined under another complex formula set forth in § 927.66. The uniform price is different from the "class" price under § 927.40.

The uniform price formula takes into account, among other things, the class price and the volume of milk in each classification received by pool plants in the marketing area during the appropriate monthly periods.

In essence, the value of all milk received by pool plants from producers is computed by multiplying the total quantity of milk in each classification by its class price. To this total is added the total of compensatory payments required to be made by handlers for milk purchased from suppliers not denominated as producers under the order which is considered to be outside the pool. Such suppliers include dairy farmers not within the New York-New Jersey marketing area, such as the Connecticut dairy farmers from whom Fitchett purchased the milk involved here. The total of these two figures is then divided by the total quantity of milk received by pool plants from producers during the period involved. In this manner the "uniform

price" per cwt. for the period is arrived at.

There are adjustments in the "uniform price" to be paid to various producers arising mainly from so-called "location differentials" (§ 927.71) having to do with the distance between the producer's farm and the relevant consumer market. Thus, the minimum amount which a handler is required to pay to a particular producer for his milk is the "uniform price" plus adjustments for differentials.

3. Producer Settlement Fund: Sections 927.75 to 927.84 of Order 27 establish a "Producer Settlement Fund" and provide for its operation. Through this fund adjustments are made as between handlers to compensate for differences between the utilization value of milk which a handler acquires from a producer and the uniform price which the handler is required to pay the producer.

Some handlers use the milk which they acquire largely for Class I utilization purposes, e. g., for fluid consumption, while others use a larger proportion of their milk receipts in lower utilization categories, e. g., for manufactured milk products. This results in a plus or minus variance between the utilization value to the handler of milk which he has purchased and the uniform price paid to the producer. Thus, for handlers who dispose of milk mainly for lower use classifications the uniform price paid to producers is higher than the value to them of the milk which they dispose of. On the other hand, for handlers who dispose of milk for highest use classification, i. e., fluid consumption, the uniform price paid therefor is lower than the value to them of the milk disposed of.

The primary purpose of the Producer Settlement Fund mechanism is to adjust the ultimate cost of milk as between handlers disposing of milk in different use classifications so that the uniform price to producers may be maintained without undue hardship to individual handlers. The result is a reasonable balance between the value of milk to a handler in

terms of end use utilization and the amount he pays for it.

Each handler is required to report to the market administrator monthly the total quantity of milk which it has purchased, the sources from which purchased (whether from producers or other sources) and the ultimate use to which the milk was put. On the basis of such reports the administrator computes the value to the handler of the milk which he purchased from producers during the period. This computation is arrived at by multiplying the amount of producer milk received by the handler used in each classification by the class price. The administrator also computes the total amount paid by the handler for milk purchased from producers at the uniform price. If the classification value to the handler of the milk purchased from producers is greater than the amount paid to producers at the uniform price, the handler is debited with the difference and he is required to pay such difference to the Producer Settlement Fund. If, on the other hand, the amount paid to producers at the uniform price is greater than the classification value of the milk to the handler, the handler is entitled to receive the difference from the Producer Settlement Fund.

There is one additional factor which may enter into the computation of the handler's debit or credit with the Producer Settlement Fund. As has been indicated, handlers may buy milk from suppliers, such as Connecticut dairy farmers who are not defined as producers by Order 27 (§ 927.6). Handlers are not required to pay the uniform price for milk purchased from such sources and thus can purchase such milk at a cheaper price. The amount of milk in the higher classifications, such as fluid milk for drinking purposes, which can be disposed of to the consuming public in a given market area, is limited. Cheaper milk bought by handlers from suppliers outside the market area, such as Connecticut, is thus in a position to compete with and displace milk in higher use classifications which otherwise would be purchased from producers in this market area at the uniform price. In order to prevent an influx of cheaper milk from displacing milk within the market area and upsetting the delicate balance of the price regulatory structure established, Order 27 provides for payments by handlers to the Producer Settlement Fund to make adjustments for purchases of cheaper milk from outside the market area.

4. Compensatory payments: As has been indicated, purchases of milk by a handler from suppliers outside the New York-New Jersey marketing area, such as Connecticut, may disrupt the regulatory scheme provided by Order 27. Such disruption may occur in at least two respects—(1) handlers in the marketing area who are required through the Producer Settlement Fund to pay the minimum class price for the milk which they purchase from market area producers, may find themselves undercut by those handlers dealing in outside milk purchased at unregulated prices; (2) producers in the marketing area who receive a "uniform price" dependent on how much of the relatively constant fluid milk demand they supply in a given month, may find that the outside milk occupies a portion of that premium market. Thus, the milk which they supply may be displaced by outside milk in the higher value classifications and forced into less rewarding surplus uses with the ultimate effect of diminishing the uniform price paid.

To avoid these consequences a "compensatory payment" plan is provided by § 927.83 of Order 27, the relevant portions of which are set forth in the margin.[3] It is this section with which we

---

3. "Sec. 927.83. Payments shall be made by handlers to producers, through the producer settlement fund, for milk and milk products under conditions, in amounts, and by the handler pursuant to paragraphs (a) through (d) of this section: * * *.

"(a) Payments shall be made for milk, concentrated fluid milk, fluid milk products, cultured or flavored milk drinks,

are concerned in the case at bar. In substance, the section provides that a handler who brings outside milk into the New York area must make payments to the Producer Settlement Fund on account of such milk according to formulae set forth.

It is unnecessary to go into all of such formulae. The formula which concerns us here is that under § 927.83(b) (1) which obligates a handler purchasing milk from specified Connecticut sources to pay the difference between the value of such milk at the Connecticut class price and "the value computed in accordance with" the New York-New Jersey "classification and pricing" under Order 27.

The theoretical effect of such payments is twofold. First, the cost to handlers of Connecticut milk purchased for distribution in the New York-New Jersey marketing area is increased and thus competition with and displacement of New York-New Jersey producer milk is diminished. Second, since, in computing the "uniform price" the total amount of such compensatory payments is added to the value of all milk received by handlers from producers, the uniform price payable to producers is correspondingly maintained at a fair level.

cream, half and half, fluid cream products, and skim milk, which milk or milk products meets each of the following conditions:
"(1) It was derived from milk received at a nonpool plant from dairy farmers, from dairy farmers defined as producers pursuant to the provisions of Part 1019 [Connecticut Order 119] of this chapter, or received from a handler designated as a producer-handler pursuant to Sec. 927.15
"(2) It was shipped to, received in, or distributed in the marketing area, or was received at a pool plant outside the marketing area.
"(3) The milk or milk equivalent of the butterfat is classified as Class I–A or Class II, or the skim milk would be subject to the fluid skim differential if it were derived from pool milk.

*The application of § 927.83(b) (1) in the case at bar.*

The relevant findings of fact made by the judicial officer in his decision and order upholding the action of the market administrator by his order upon reconsideration, are in substance as follows:

Fitchett is a handler regulated by the New York-New Jersey Milk Marketing Order No. 27, operating a pool plant thereunder. During certain months in 1959 and 1961 Fitchett received milk at its Poughkeepsie plant direct from dairy farmers in Connecticut.[4] These dairy farmers were defined as producers under Connecticut Milk Marketing Order No. 119 regulating milk in that marketing area but not as producers under the New York-New Jersey order.

Generally speaking, § 927.83 of Order 27 requires compensatory payments by New York handlers operating pool plants, such as Fitchett, to the Producer Settlement Fund for milk in the higher classifications received by them from certain types of suppliers who are not defined as New York producers. Paragraph (a) (1) of § 927.83 specifically places milk received from "dairy farmers defined as producers" under the Connecticut Marketing Order No. 119 within this category. Fitchett's Connecticut suppliers were "dairy farmers defined as pro-

"(b) The amounts of payment for the products set forth in paragraph (a) of this section shall be as follows:
"(1) If the milk or the milk equivalent of the butterfat, or the skim milk is classified and paid for under another order issued pursuant to the Act, the amount of payment on such products except skim milk, shall be any plus amount obtained by subtracting the value of the milk or the milk equivalent of the butterfat at the class price or prices under such order from the value computed in accordance with the classification and pricing set forth in this subpart: [7 C. F.R. Part 927 et seq.] * * *."

4. The record before the hearing examiner is confusing. However, before me both sides stood on the record and did not claim that any of the findings of fact made by the judicial officer were incorrect.

ducers" under the Connecticut Marketing Order as the judicial officer specifically found. Therefore, Fitchett was required to make the compensatory payments provided by § 927.83 for the milk involved here which it received from these sources.

Computation of the compensatory payments required to be made by the handler under such circumstances is governed by paragraph (b) (1) of § 927.83.

This paragraph provides that the amount of compensatory payments on milk "classified and paid for under" the Connecticut order, such as the Fitchett milk, "shall be any plus amount obtained by subtracting the value of the milk" at the "class price or prices" under the Connecticut order "from the value computed in accordance with the classification and pricing set forth" in the New York Order. Thus, under the paragraph (b) (1) formula, the value of the milk at the Connecticut class price is the subtrahend and its value computed in accordance with New York classification and pricing is the minuend. Any plus difference between the two determines the amount of the payment.

The market administrator purported to compute the amount owing by Fitchett for Connecticut milk according to this formula. How did he make this computation?

To determine the value in accordance with New York classification and pricing he first classified the milk received according to its actual use under § 927.37 prescribing the "classes of utilization." He then determined the class price per cwt. of milk falling into each classification under § 927.40 which provides the formulae for "class" or "minimum" prices.

Under § 927.40 class prices are subject to various differentials and adjustments depending on the source of the milk. For milk received "from producers or cooperative associations of producers" the class price per cwt. is "subject to the differentials and adjustments" in Secs. 927.41 through 927.44. On the other hand, for milk received from "a cooperative association of producers which is also a handler" the class price is "subject to the differentials and adjustments in Secs. 927.41 through 927.44 *and Sec. 927.71(c).*" (Emphasis added.)

The two applicable differentials under §§ 927.41 through 927.44 are a butterfat differential (§ 927.41) and a transportation differential (§ 927.42). In determining the total class price per cwt. of Fitchett's milk the market administrator not only added these two differentials but also added a third—a 10¢ per cwt. direct delivery differential under § 927.71(c).[5]

The administrator computed the total value of the Connecticut milk according to New York classification and pricing by multiplying the quantity of milk in each classification by the appropriate class price with adjustments for the butterfat, transportation, *and* direct delivery differentials. He then computed the value of the milk at the Connecticut class prices. The latter figure was subtracted from the former and the remainder was the amount of the compensatory payment assessed against Fitchett for the period.

Fitchett does not dispute the correctness of the computations except as to the addition of the 10¢ per cwt. direct delivery differential provided by § 927.71 (c) to the class price per cwt. Plaintiff contends that the addition of the 10¢ per cwt. direct delivery differential is not authorized by the marketing order.

It will be remembered that the Class Price section, § 927.40, provides that milk received "from producers or cooperative

5. To illustrate, the administrator determined the total class price per cwt. of the milk in question for the month of April 1961, as follows:

| | | |
|---|---|---|
| Class I–A, as published | $5.08 | (§ .40(a)) |
| Butterfat differential | .0674 | (§ .41) |
| Transportation differential | .18 | (§ .42) |
| Direct delivery differential | .10 | (§ .71(c)) |
| | $5.4274 | |

associations of producers" is subject only to the differentials and adjustments in §§ 927.41 through 927.44, in this case only the butterfat differential (§ 927.41) and the transportation differential (§ 927.42) respectively. Milk from "a cooperative association of producers which is also a handler" is subject not only to the differentials and adjustments in §§ 927.41 through 927.44, but also to the additional direct delivery differential provided in § 927.71 (c). The mandate of § 927.83(b) (1) is that the New York classification and pricing of the Connecticut milk for purposes of computing its New York value shall be the same as if it were milk received from sources within the New York marketing area. Since the milk involved here was found to be Connecticut producer milk, the market administrator purported to compute its New York value in accordance with New York classification and pricing as if it were New York producer milk.

The first sentence of § 927.40 plainly states that the differentials and adjustments with respect to producer milk are only those in §§ 927.41 through 927.44. That this was intended to and did exclude the direct delivery differential provided in § 927.71(c) is plainly indicated by the inclusion of such differential for milk received from "a cooperative association of producers which is also a handler" in the second sentence of § 927.40 and the deliberate omission of this differential from the first sentence covering producer milk. Despite this, the administrator added the direct delivery differential of 10¢ per cwt. provided by § 927.71(c) which did not apply to the class price of New York producer milk.

The judicial officer agreed that the milk Fitchett received from Connecticut producers should be treated as New York producer milk for purposes of New York classification and pricing. He did not attempt to apply the second sentence of § 927.40 to the Fitchett milk or to treat such milk as received from "a cooperative association of producers which is also a handler." Indeed, had he attempted to do so Fitchett's Connecticut milk would not have come under § 927.83 at all.

Nevertheless, the judicial officer upheld the addition of the 10¢ per cwt. direct delivery differential by the administrator. He said that paragraph (b) (1) is "not limited to value determined at class prices or in connection with the uniform price or a handler's net pool obligation" [6] (the obligation to the Producer Settlement Fund) but includes all components which go into the cost of milk bought from New York producers to the handler, including the 10¢ per cwt. differential involved here. He held the differential to be "an integral part of milk *pricing*" [7] under the order even though the differential was not a component in computing the class or minimum price of the Fitchett milk and was outside the computations of the amount payable therefor to the Producer Settlement Fund.

This construction of paragraph (b) (1) is contrary to the plain language of § 927.83. It is also directly contrary to the construction which the Secretary of Agriculture placed on paragraph (b) (1) in his decision promulgating § 927.83 and in other instances.

The judicial officer attempted to justify his erroneous construction on the premise that the result was in keeping with what he conceived to be the purpose of § 927.83. But his conception of purpose is also at variance with what the Secretary stated the purpose to be when he promulgated these provisions.

(1)

Paragraph (b) (1) of § 927.83 calls for computation of the New York "value" of the milk obtained from Connecticut suppliers in accordance with New York-New Jersey "classification and pricing." This language clearly requires the computation of value in terms of the class and the class price of milk as

6. P. 3, Order upon Reconsideration.

7. P. 2, Order upon Reconsideration (Emphasis supplied.)

used to determine handlers' obligations to the Producer Settlement Fund. These are computations relating to the *value* of the milk—that is to say, what specific purchases of milk are worth to the handler—as distinguished from the artificial "uniform price" as adjusted which is paid to the producer regardless of what the milk purchased is actually worth to the handler. The "classification and pricing" required to be used plainly refers to the class of the milk purchased and its class price which are the factors which enter into the determination of such value. Neither the class of the milk received from producers nor the class price of such milk includes the direct delivery differential.

The calculation of "uniform price" and of the additional payments to be made to producers for the direct delivery differential is quite a different concept and cannot fairly be read into the language of paragraph (b) (1). See Barron Coop. Creamery v. Wickard, 140 F.2d 485, 488 (7 Cir. 1944).

But even if this were not plain it is apparent from other provisions of paragraph (b) of § 927.83 that adjustments for the location of the plant such as the direct delivery differential were not to be included in the computations of New York value under (b) (1).

(a) In the "provided further" clause of paragraph (b) (1) it is specifically provided that the amount of the payments on skim milk shall be "adjusted for the location of the plant" and thus includes the direct delivery differential under § 927.71(c).

(b) The next paragraph, (b) (2), states

"The amount of payment * * * shall be the differences between its classified value at the Class I-A or the Class II price, depending upon its classification, and its value at the Class III price, such class prices to be adjusted for the butterfat test *and the location of the plant* at which the nonpool milk was originally re-

ceived from the farmers * * *." [Emphasis added.]

(c) The same wording is included in paragraph (b) (3).

Thus, location differentials which include direct delivery differentials, omitted from the language of paragraph (b) (1) which is being construed here, are expressly included in three other parts of paragraph (b). Where the order intended direct delivery differentials to be included in the computation it said so, and where it did not specifically include them they were intended to be excluded. See Brannan v. Stark, 342 U.S. 451, 461, 72 S.Ct. 433, 96 L.Ed. 495, Fn. 12 (1952).

(2)

The Secretary of Agriculture at least three times has construed the words "value computed in accordance with the classification and pricing" as used in paragraph (b) (1) of § 927.83, to mean value in terms of class and class price.

(a) § 927.83 was promulgated in 1953, 18 Fed.Reg. 8444.[8] Before promulgating or amending a marketing order the Secretary must hold hearings on the proposed changes and make findings to support the changes as finally promulgated (Agricultural Adjustment Act, 7 U.S.C. § 608c). With respect to paragraph (b) (1) of § 927.83 the Secretary made the specific finding that (18 Fed.Reg. 8448):

"the price advantage which such milk [milk from out of state suppliers] would have over pool milk priced under the New York order would be the amount by which the class price under the other [e. g., Connecticut] order *is less than the* New York order *class price* at the plant where the milk is received from the farmers." (Emphasis added.)

(b) In the notice of hearing on the proposed changes the Secretary stated that the revision of § 927.83 would provide (18 Fed.Reg. 256, 259 (1953)):

"Where the milk is classified and paid for under another order of the Secretary, provide for payment of

---

8. Then designated § 927.78.

the amount by which the value of the milk at the *Class I or Class II price* exceeds its value at the class prices under the other order, * * the payment shall be * * *." (Emphasis added.)

Paragraph (b) (1) § 927.83 was promulgated as proposed.

(c) In 1959 the Secretary promulgated amendments to Connecticut Order No. 119. In his findings on the promulgation he found that the New York Order 27 required that (24 Fed.Reg. 1049, 1057 (1959)):

"The New York-New Jersey handler who receives the fluid milk product [from Connecticut] will be obligated, pursuant to the terms of Order No. 27, to pay into the producer-settlement fund of such order the difference between such Connecticut classification price and the Order No. 27 *price of the class* of use in the New York-New Jersey plant." (Emphasis added.)

(3)

Section 927.83 was significantly amended effective January 1, 1964[9] so as to expressly include the direct delivery differential in the computations of New York value. As then amended, the section read:

"* * * each handler shall pay a differential for milk classified as Class I-A or Class II equal to the difference between Class II price under Part 1015 [successor to Order 119] of this chapter and the appropriate class price *as adjusted for appropriate differentials including the direct delivery differential* set forth in Sec. 1002.71(c), [formerly § 927.71(c).]" (Emphasis added.)

█ This material change in phraseology made by the Secretary specifically to include the direct delivery differential as part of the computation of the pay-

ments to be made for Connecticut milk is an additional indication that the section as it read before the amendment did not include the differential. Cf. Hudson Motor Car Co. v. Hertz, 121 F.2d 326, 329 (6 Cir.), cert. den. 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 557 (1941); Mabie v. Fuller, 255 N.Y. 194, 201, 174 N.E. 450 (1931). Moreover, it is also an additional indication that where the Secretary intended the differential to be included he said so in plain language and that therefore the differential was not meant to be included in paragraph (b) (1) prior to the amendment.

(4)

In his 1953 decision approving the promulgation of § 927.83, which has already been referred to, the Secretary found that a suitable charge was needed to place New York and Connecticut milk "on substantially similar competitive positions" (18 Fed.Reg. 8448). He found that the formula set forth in § 927.83 met these standards and "closely approximates the theoretically desirable rate which would be sufficient to offset the artificial advantages in favor of nonpool milk * * *." (Id.) Thus the Secretary concluded that the computation of New York value which he said was to be made in terms of class and class price would result in placing New York and Connecticut milk in "substantially similar competitive positions." He evidently did not consider it necessary to include the direct delivery differential in the computation to accomplish that purpose.

The judicial officer reached the contrary conclusion upon the premise that "the general purpose of Section 927.83 is to *equalize* the *cost* of nonpool milk disposed of in the marketing area with the *cost* of pool milk, that is, fully regulated milk" [emphasis added], and that the inclusion of the differential was necessary to accomplish that purpose. (P. 6, Decision and Order.) By so doing he sought to achieve precise equalization[10] of costs.

9. Section 927.83 was designated § 1002.44 of Order No. 2, the successor to Order No. 27 (7 C.F.R. § 1002.44).

10. It is unnecessary to pass on the question of whether the computation adopted by the judicial officer did in fact achieve

■ But this was not what the Secretary intended. All that he intended was to place the New York and Connecticut milk in "substantially similar competitive positions." Nowhere did he indicate that precise *equalization* of *cost* was the objective of the section.

The real difficulty with the judicial officer's conclusion appears to be that he misconceived the purpose of paragraph (b)(1) and then misconstrued its language so as to accomplish that misconceived purpose. It was his view that "the pertinent decision of the Secretary * * * is inexact and inconclusive on the narrow issue of order construction presented herein." (P.3, f.n. 3, Order upon Reconsideration). The judicial officer substituted his own construction.

But the pronouncements of the Secretary on the issue of construction are neither inexact nor inconclusive. They demonstrate that New York value is to be computed in terms of class and class price. The language of paragraph (b)(1) itself is reasonably plain on that subject and, as the Secretary indicated, the language used accomplishes the purpose intended.

■ The construction placed upon paragraph (b)(1) of § 927.83 by the judicial officer is clearly erroneous and not in accordance with law. The direct delivery differential should not have been included in the computation of Fitchett's obligation to the Producer Settlement Fund for the milk which it purchased from Connecticut dairy farmers.

Defendant's motion for judgment on the pleadings and on the record before the Department is denied. Plaintiff's cross-motion for such relief is granted. The order and decision and the order upon reconsideration of the judicial officer are vacated and set aside and the matter is remanded to the Secretary of Agriculture for such further proceedings as the law may require and as are consistent with this opinion.

It is so ordered.

---

precise equalization though that question is not free from doubt. If, as may be the case, the computation resulted in increasing the cost of the Connecticut milk above the cost of similar New York milk Lehigh Valley Co-op Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) might well become apposite.