**Lorton BLAIR et al., Appellants,**

**v.**

**Orville FREEMAN, Secretary of Agriculture of the United States, Appellee.**

**No. 19801.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 21, 1966.

Decided Nov. 18, 1966.

---

Mr. Charles Patrick Ryan, Washington, D. C., and Mr. C. Wayne Smyth, Troy, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, for appellants.

Mr. Edward Berlin, Atty., Dept. of Justice, with whom Asst. Atty. Gen. John W. Douglas, Messrs. David G. Bress, U. S. Atty., Neil Brooks, Asst.

Gen. Counsel, Dept. of Agriculture, and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellee. Mr. Morton Hollander, Atty., Dept. of Justice, also entered an appearance for appellee.

Mr. Lawrence D. Hollman, Washington, D. C., filed a brief on behalf of New England Milk Producers' Assn., Connecticut Milk Producers Assn., Local Dairymen's Cooperative Assn., Inc., and Producers Dairy Co. as amici curiae, urging affirmance.

Mr. John A. Cardon, Washington, D. C., filed a brief on behalf of Dairymen's League Cooperative Assn., Inc., and United Milk Producers' Cooperative Assn. of New Jersey as amici curiae, urging affirmance.

Before DANAHER, MCGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellants are Pennsylvania dairy farmers who brought this action against the Secretary of Agriculture for themselves and for other milk producers similarly situated, seeking declaratory relief and an injunction restraining his enforcement of the so-called "nearby differential" provision[1] in the milk marketing regulation governing the New York-New Jersey Milk Marketing Area. The District Court, after a hearing, found the challenged provision within the power of the Secretary and supported by substantial evidence, and consequently granted the Secretary's motion to dismiss the complaint.

A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority. In this case, however, continued reflection and diligent study have strengthened rather than shaken our conclusion that the Secretary's order is an invalid departure from the statutory scheme established by Congress.

We shall first set forth the reasons why we think the judgment of the District Court must be reversed and then turn to questions concerning the appropriate judgment.

I

Since the mid-1930's, Congress has provided for the comprehensive regulation of the marketing of various agricultural commodities, including milk and milk products, in the metropolitan areas of this country. The basic plan for this sweeping economic program derives from the Agricultural Marketing Agreement Act of 1937, as amended, hereafter the Act.[2] This law confers upon the Secretary of Agriculture the primary responsibility for establishing and maintaining "such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices * * *."[3]

Difficult and peculiar problems afflicting the milk industry have long prompted attempts to smooth out the erratic fortunes of milk marketing through the regulation of prices and production.[4] Consumer demand for milk as a beverage in the form of "fluid milk" is relatively constant throughout the year, but the productivity of cows reflects marked seasonal fluctuation. Maintenance of herds large enough to satisfy the demand in the fall and winter months results in huge surpluses in fluid milk during the flush spring and summer season. The fluid milk surpluses move into cream, butter, cheese, ice cream, milk powder, and other more or less nonperishable milk products. But these milk products are in competition with similar

---

1. 7 C.F.R. § 1002.71(b) (1966).

2. 50 Stat. 246, as amended, 7 U.S.C. §§ 601–624 (1964), as amended, 7 U.S.C. §§ 602 to 612c—1 (Supp. I, 1965).

3. 50 Stat. 246, as amended, 7 U.S.C. § 602 (1) (1964).

4. See, e. g., Nebbia v. People of State of New York, 291 U.S. 502, 516–518, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

dairy products produced in other areas. Hence the prices for the surplus milk absorbed by these secondary commodity markets must necessarily be competitive with low-cost production areas far removed from the metropolitan centers. Lest all producers seek to channel their milk into the most profitable fluid milk market, with the inevitable consequence of ruinous price competition and unstable farm incomes,[5] Congress has authorized the Secretary to normalize the harsh consequences of milk cycles insofar as possible by apportioning the benefits and burdens of market variables.

The regulation being challenged here arose under § 8c of the Act, empowering the Secretary to issue orders applicable to producers and handlers of the agricultural commodities specified.[6] Beginning in 1938, the Secretary has exercised this power to regulate the handling of milk in New York City and three suburban counties (Westchester, Nassau and Suffolk). In 1957 the order was amended and extended to certain additional counties in New York and to northern New Jersey, in Order Number 2, the New York-New Jersey Milk Marketing Order.[7] Because this market touches the national milk market and because, as the Secretary has found, the needs of the area demand that milk from at least 400 miles away be regularly supplied,[8] this Order directly affects dairy farmers like the appellants whose facilities are located in still other states. The segment of the economy here involved embraces a billion dollar industry, billions of pounds of milk annually, and over 50,000 milk producers serving the market.

The essence of the regulation is an effort to avoid the feverish competition by producers for the limited, but premium priced, fluid milk market by fixing a "blended" or average minimum price payable to all producers irrespective of the use to which their particular milk is ultimately put.[9] A producer settlement fund is operated by the official market administrator,[10] and a handler[11] makes payments into or withdrawals from the fund depending on the extent to which the use value of the milk he handled exceeds or falls short of the uniform blended price. While the handlers thus pay into the fund varying amounts geared to the use of the milk, every producer receives a uniform minimum price for the milk he sells regardless of use.[12] Grant v. Benson, 97 U.S.App. D.C. 191, 193, 229 F.2d 765, 767 (1955), cert. denied, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875 (1956). However, the Act provides that this uniform minimum price is subject to adjustments for differentials authorized by the Act for quality, location, or other market variations.

Section 8c(5) of the Act in pertinent part directs that milk marketing orders "shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others: * * *." Among the provisions includable are those—

　(B)　Providing:

　　(i) for the payment to all producers and associations of producers delivering milk to the same han-

---

5. See United States v. Rock Royal Co-op., Inc., 307 U.S. 533, 549–550, 59 S.Ct. 993, 83 L.Ed. 1446 (1939) (upholding the constitutionality of the portions of the Act relevant here); Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 78–81, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962).

6. 50 Stat. 247 (1937), as amended, 7 U.S.C. § 608c (1964), as amended 7 U.S.C. § 608c (Supp. I, 1965).

7. 7 C.F.R. §§ 1002.1–.99 (1966).

8. See 22 Fed.Reg. 4212 (1957).

9. The mechanics of this computation are described in H.P. Hood & Sons, Inc. v. United States, 307 U.S. 588, 593–594, 59 S.Ct. 1019, 83 L.Ed. 1478 (1939).

10. 7 C.F.R. § 1002.75 (1966).

11. The term "handler" is defined at 7 C.F.R. § 1002.7 (1966).

12. See 28 Fed.Reg. 11957 (1963).

dler of uniform prices for all milk delivered by them * * *;

> (ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made * * *.

Relying on clause (c), the Secretary has incorporated in the Order three variables which he has generally denominated "location differentials":[13] (a) One is a "transportation differential" precisely reflective of the terms of the Act, under which an amount per unit is added to or subtracted from the uniform minimum price payable to the producer varying with the place of the delivery to the handler. This is related to proximity of the delivery to the core of the market area, with consequent savings in transshipment costs. (b) Second is the "nearby differential." (c) Third is the "direct delivery differential" payable to producers who make direct delivery to a handler's plant located within 70 miles of specified market centers. This differential is based on factors other than transportation costs; it is payable by the individual handlers in consideration of the trouble and expenses they are saved, and is not charged to the producer settlement fund. It is not challenged in this action.

The disputed "nearby differential" provided by § 1002.71(b) contains two elements that are notable. (1) The differential is calculated on the basis of the zone in which the producer's farm is located, with the band from 1–50 miles from Columbus Circle in New York City receiving the highest premium, with diminution in each subsequent ten mile arc. There are eight zones. With irrelevant exceptions no producer located more than 120 miles away may qualify for this nearby differential. However, the Secretary has decreed that "all farms located in the State of New Jersey shall be considered to be in the 1–50 mile zone."[14] (2) Moreover, and revealingly, the amount of the nearby differential is highest when Class I (fluid milk) utilization in the marketing area is lowest, and decreases as fluid milk utilization increases marketwide, measured by the data for the preceding 12-month period. At the point when 80% of the marketed milk has been used as fluid milk, no "nearby differential" is available as an adjustment.

■ Appellants, Pennsylvania dairy producers not eligible for the "nearby differential" due to location of their farms outside the 120-mile area, have standing to present their claim that the nearby differential provision exceeded the statutory power of the Secretary.[15] Since we agree with this contention we find it unnecessary to reach their alternative contention that the differential was based on such artificial and circular statistics and findings that the Secretary's action was arbitrary and irrational.

The District Court held that the nearby differential lay within the permissible

13. 7 C.F.R. § 1002.71 (1966). The transportation differential appears at § 1002.71 (a); the nearby differential challenged here appears at § 1002.71(b); the direct delivery differential appears at § 1002.71 (c). For the Secretary's paraphrase of the nature of these differentials, see 22 Fed.Reg. 4212 (1957).

14. 7 C.F.R. § 1002.71(b) (1) (1966).

15. Since this differential is payable out of the equalization pool, the deduction reduces *pro tanto* the amount actually received by producers for their milk. The appellants thus have standing to invoke the protection of equity to insure that their statutory right to minimum price protection is not being improperly diminished. Stark v. Wickard, 321 U.S. 288, 290, 302–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944).

discretion of the Secretary of Agriculture in implementing the objectives of the Act. But this is not a case in which Congress has decreed general principles of control and left it to an executive official or administrative agency in the exercise of vaguely defined latitude to flesh out the regulatory skeleton. The Act was passed shortly after the Supreme Court had condemned major aspects of Congressional attempts at economic regulation because legislative power had been too broadly delegated to administrative functionaries.[16] When it turned to amending the agricultural program and drafted Section 8c, Congress was careful to avoid any similar obstacles.[17] The applicable committee reports expressly reveal the caution with which Congress reacted "to make certain * * * that no authority to carry out the program will be conferred in conflict with the principle that power cannot be delegated to an executive officer unless adequate standards are provided by Congress to guide him in exercising such power."[18]

This informative legislative history is confirmed by the language used in the drafting of the statute. Section 8c(5) directs the Secretary to include in milk marketing orders "one or more of the following terms and conditions, *and* (except as provided in subsection (7) of this section) *no others* * * *." (Emphasis added.) Included in the allowable terms are the provision for the payment of uniform prices to all producers, "subject * * * only" to certain enumerated differentials. Subsection (7) relates to permissible terms generally available for insertion in any agricultural order, and is relevant only in authorizing provisions "(D) Incidental to, *and not inconsistent with,* the terms and conditions specified" in subsection (5), "and necessary to effectuate the other provisions of such order." (Emphasis added.)

■ Congress carefully explained that under Section 8c, orders "can contain only such terms and conditions as are expressly authorized in the bill. Furthermore, the amendments contain provisions intended to safeguard the exercise of and prevent abuses in the application of the regulatory power conferred upon the Secretary."[19] When a provision is not compatible with the narrow and precise terms enumerated in Section 8c(5), the Secretary may not claim that subsection (7) (D) sanctions a differential that he has found "incidental to" or even "necessary for" the effectuation of other, authorized elements of the order.[20]

In Brannan v. Stark, 87 U.S.App.D.C. 388, 185 F.2d 871 (1950), invalidating payments out of the pool to producers' cooperatives, we pointed out that this statute was narrowly drawn under the impetus of *Schechter* to avoid broad delegation and that subsection (7) (D) must be read in light of and to avoid encroachment on the essential statutory objective of securing to all producers a fixed minimum price, without cutting down the share of that price paid to particular producers and diverting part to other producers, no matter what benign purpose prompts the Secretary to a contrary

---

16. *E. g.,* A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); Panama Rfg. Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

17. Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 91–92, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962); Brannan v. Stark, 342 U.S. 451, 465, 72 S.Ct. 433, 96 L.Ed. 497 n. 16 (1952); United States v. Rock Royal Co-op., Inc., 307 U.S. 533, 574–576, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

18. H.R.Rep. No. 1241, 74th Cong., 1st Sess. 1 (1935); S.Rep. No. 1011, 74th Cong., 1st Sess. 1 (1935).

19. H.R.Rep. No. 1241, 74th Cong., 1st Sess. 7 (1935); S.Rep. No. 1011, 74th Cong., 1st Sess. 3 (1935).

20. See Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 97–98, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962); Brannan v. Stark, 342 U.S. 451, 456–462, 72 S.Ct. 433, 96 L.Ed. 497 (1952), voiding certain aspects of milk marketing orders and rejecting contentions based on subsection (7) (D).

stance. In affirming, the Supreme Court underlined the need to remain within the scheme of the Act—uniform minimum prices to all producers subject only to the specific adjustments enumerated in the Act—without any broad charter to create other differentials. Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952).

■ In testing the Secretary's order in the case at bar we take into account the narrow confines of the Secretary's power and the need for determining validity in the light of the purported source of authority and the underlying rationale that the record discloses were relied on by the Secretary.[21]

■ Although the Secretary of Agriculture called the nearby differential a "location differential," [22] one of the price adjustment factors permitted under Section 8c(5) (B), the Act does not authorize variations premised on any difference in location whatsoever, but rather speaks of adjustments for "(c) the locations at which delivery of such milk is made * * *." Plainly, then, the regulation reflects an inconsistency with the terms of the Act, for the "nearby differential" hinges not on the place of delivery, but on the location of the producer's farm, and this is quite another matter. In this respect the nearby differential stands in eloquent contrast to the other differentials in the regulation that do depend on place of delivery, the transportation differential [23] and the direct delivery differential.[24]

The Secretary's order reviews the several factors and considerations that had been advanced to him to support a nearby differential provision. Among them were (1) increased production costs in the immediate metropolitan area, (2) the historical payment of such adjustments,

(3) the inherent value of nearby milk because of its availability and high quality, (4) the more intimate relation between producer and handler, (5) compensation for a relatively more even seasonal production, and (6) compensation of the nearby producer for reduction in his share of the *fluid milk* market resulting from his participation in a market-wide pool.[25]

The Secretary rejected all but the last two of these proferred grounds, finding that these two alone might represent "values for which compensation appropriately may be derived from the pool rather than directly from the handler receiving the milk." [26] We need not consider whether the relatively uniform seasonal production argument could have been relied on because the Secretary makes clear that he did not rely on it. He noted that there is "considerable variation in the seasonal pattern of production among individual producers in all sections of the milkshed. * * * " [27] The Secretary added that a proposal for a "base rating plan" might be a more equitable plan for apportioning returns to compensate producers for this factor. Apparently, however, no such plan was adopted.

■ In the ultimate, therefore, the nearby differential was designed by the Secretary to compensate nearby producers for the reduction in their share of the fluid milk market resulting from their inclusion in the blended uniform price system. The findings underlying this approach were that historically a disproportionately significant segment of the premium-priced market for fluid milk had been captured by producers located nearest to the core of the New York metropolitan area, and thus by participating in the pool these producers were in effect surrendering a very real economic ad-

21. SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

22. See 22 Fed.Reg. 4212 (1957). See generally 7 C.F.R. § 1002.71 (1966) (Location differentials).

23. See 22 Fed.Reg. 4212 (1957); 7 C.F.R. § 1002.71(a) (1966).

24. See 22 Fed.Reg. 4212 (1957); 7 C.F.R. § 1002.71(c) (1966).

25. 22 Fed.Reg. 4213 (1957).

26. *Ibid.*

27. *Ibid.*

vantage.[28] We need not consider appellants' speculation that the establishment of this differential, arranged so that all farms in the entire state of New Jersey were to be treated as if in the most favorable (1–50 mile) zone, was in reality an appetizer to sweeten the proposal so that New Jersey producers would vote in the statutory referendum to extend the New York Milk Marketing Order to New Jersey handlers.[29] We hold that, irrespective of motive, the Act forbids consideration of the use to which the milk of a particular producer or class of producers is put, historically or potentially, in adjusting the uniform minimum price to be paid to such producers.

The core of the Congressional program was a uniform minimum price for producers that did not turn on or vary with the nature of the use for which a producer was able to dispose of his milk. Hectic and unsettling competition among producers impelled Congress to formulate a device—uniform prices apportioned irrespective of individual utilization—that would recognize the use factor in the equation developed to compute the marketwide pool, but which would not distinguish between producers on the basis of the use made of their milk.

Calling the nearby differential a "location" adjustment does not establish its permissibility. It clearly is not based on the location of delivery to the handler, the terms in which the Act speaks. It disqualifies appellants and others because of the location of their farms, without regard to place of delivery to the handler. The critical element in the Secretary's view was that nearby producers traditionally occupied the lion's share of the fluid milk market. Possibly he also concluded that the product of nearby producers was preferred by handlers to milk of more remote producers for fluid milk purposes, for reasons not set forth or even conjectured by him—but plainly not reasons of quality or savings in transportation cost. This differential, he said, was explicitly intended "to give the nearby producer a somewhat greater share of the high-priced Class I–A [fluid] milk than he would obtain through marketwide pooling without such a differential * * *." 22 Fed.Reg. 4213–14 (1957). It was "designed to reflect the fact that under competitive conditions milk produced in this area has a traditional outlet as fluid milk * * *." 22 Fed.Reg. 4214 (1957).

The short answer is that Congress was well aware of the "competitive conditions" in this industry, and clearly intended to override them. For the general welfare of all, it decreed that some producers might have to foresake their peculiar advantages, by requiring that uniform prices be paid to all producers, subject only to a few narrow and well-defined adjustments. Congress precluded consideration of "the use to which such milk is put by the particular handler to whom any producer or association of producers sells its milk." [30] Assuming arguendo that the nearby producer gives up one benefit, the Secretary noted that "he obtains the benefit of an established Class I [fluid milk] price which may be higher than in the absence of regulation, and is protected to some extent from the loss of a market because of competition of cheap milk from more distant sources." [31]

That the nearby differential adjustment turns on prohibited consideration of fluid milk use appears not only from the fact that eligibility for payments depends on farm location, but also from the fact that payments vary (inversely) with the

---

28. *Ibid.*

29. Under Section 8c(9) (B) (i), 50 Stat. 247 (1937), 7 U.S.C. § 608c(9) (B) (i) (1964), an order such as this must be approved by two-thirds of the producers concerned in a referendum.

30. H.R.Rep. No. 1241, 74th Cong., 1st Sess. 10 (1935); S.Rep. No. 1011, 74th Cong., 1st Sess. 10–11 (1935).

31. 22 Fed.Reg. 4213 (1957); *accord,* Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 81, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962). Plants and producers supplying milk for all parts of the territory are extensively intermingled, and to a substantial degree the milk is interchangeable among the various portions of the territory. 22 Fed. Reg. 4198 (1957).

extent of fluid milk utilization. The differential is sensitively attuned to the supposed special place of the nearby producer in the fluid milk market, and is taken away when fluid milk utilization is so high marketwide that he merits no premium based on that special place.

■ The reason for the differential was to compensate the eligible farmers for the loss of their special share of the fluid milk market.[32] Such a consideration is not affirmatively authorized by this statute which precisely circumscribes the power of the Secretary of Agriculture. On the contrary this is exactly the approach the Congress intended to prohibit.

■ The District Court relied on Green Valley Creamery, Inc. v. United States, 108 F.2d 342 (1st Cir. 1939), which approved a "location differential" in the Boston Milk Marketing Order based on the location of the producer's farm within 40 miles of Boston.[33] That dictum [34] was rested on grounds not available in support of Order No. 2 under consideration. First, the court stated that "presumably" milk from nearby farms would be "delivered to handlers at points nearby the market." 108 F.2d at 346. It is not clear why the court thought such a "presumption" justified a complete disqualification of more distant producers from making their deliveries near the market. In any event, in Order No. 2 the Secretary has elsewhere provided differ-

entials to compensate for deliveries made to nearby handlers.[35] Second, the First Circuit referred to evidence indicating that the nearby farmers had a more uniform level of production. That factual hypothesis was negatived by the Secretary himself as justification for Order No. 2. Third, the court indicated that it was primarily persuaded by its belief that the adjustment could be sustained as "customary market differentials based upon the location of farms * * *." 108 F.2d at 346. Although Section 8c(5) (B) (a) does permit "market * * * differentials customarily applied by the handlers" concerned, it is plain that this type of allowance turns not on the location of the producer's farms but on the nature of the market to which they deliver their milk.[36] The "market differential" rationale is plainly not a tenable basis for the nearby differential.[37]

We are aware that the Secretary's findings state that the nearby producers have always been able to obtain a premium, over the price paid more distant producers, higher than can be accounted for in terms of cost of transportation to market. 22 Fed.Reg. 4213 (1957). If this history has any current significance, if the milk has greater "value" to the handler for reasons other than quality and location of delivery, it may be a reason for the producer to receive out of the handler's own pocket a premium above the minimum price, but this would not be a justifi-

32. See 22 Fed.Reg. 4214 (1957).

33. Section 8c(5) (B) (ii) (c) of the Act.

34. The court's holding was that the handlers lacked standing to challenge the disposition of the producer settlement fund.

35. The transportation differential and direct delivery differential, see note 13 *supra.*

36. The Secretary was authorized to award a market differential to the producer "to compensate him for delivering his milk to a city market instead of to a country plant." H.R.Rep. No. 1241, 74th Cong., 1st Sess. 10 (1935).

The Secretary's findings underlying Order No. 2 referred to the direct delivery differentials as both location differentials

and "customary market differentials based upon the location of the plants to which producers deliver milk." 22 Fed.Reg. 4215 (1957). The nearby differential was not defended on this ground.

37. No justification on this ground is even attempted in either the Secretary's findings or the Brief for Appellee.

The Secretary does argue that another element in the decision in *Green Valley Creamery* is applicable here. The First Circuit noted that in re-enacting the Act in 1937, Congress included a general saving clause that "expressly ratified, legalized, and confirmed" outstanding orders. 50 Stat. 249. Even if this legislative technique were meant to do more than avoid mere technical abatements, it does not suggest authority to incorporate all similar administrative provisions in

cation permitted by the law for a diversion from appellants of their equal share of the blended uniform minimum price adjusted only for the statutory differentials.

We doubt that any additional comment is required on the argument of amicus curiae, that payments to nearby farmers are justified because otherwise they could establish their own milk routes or dairy stores for sale of milk in competition with established handlers, and that the statutory exclusion of any sales by producer-handlers would diminish blended prices of the non-nearby producer from the marketwide pool. We have no occasion to assess the likelihood of such competition with established and notoriously concentrated milk dealers.[38] Assuming for the sake of discussion that such competition would be regarded by Congress as contrary to the public interest, this may be a reason for the legislature to enlarge the Secretary's powers, but not for the court to overlook the limited nature of the authority hitherto conferred by Congress.

## II

The foregoing discussion showing that § 1002.71(b) of the New York-New Jersey Milk Marketing Order is unauthorized and void requires reversal of the judgment. Appellants have invoked the aid of equity in seeking a declaration of their rights and the prevention of further interference with them. We are concerned lest a declaration of invalidity in the context of such an action be deemed to require refund of moneys illegally paid and received under an invalid order.[39] A court of equity may tailor its relief with a critical and balanced view of the ramifications of its decision, including in the overall public interest a consideration of the interests of those not before the court.

Here we are confronted with an industry of labyrinthean complexity, in which hundreds of thousands of dollars in monthly adjustments were distributed to thousands of dairy farmers for a period of nine years. The recoupment of improper allowances from all "nearby" recipients would be a formidable task. Nor would elementary fairness permit the aggrieved producers to pick and choose farmers from whom they will demand redress. Doctrines of contribution among joint tort-feasors would have no automatic application to such a case. Even the producers benefited are not necessarily to be held to account for an ultra vires action taken by the Secretary in what he conceived to be the public interest.[40] An extraordinarily difficult question would arise as to whether and to what extent there should be an offset if not estoppel due to the benefit realized by appellants from the level of the blended uniform price existing under the 1957 amendment of the Order, which contained

subsequent orders. In addition, the revealing conditions that make the present differential turn on the nearby location of the farm and on the percentage utilization of fluid milk did not appear in the New York Milk Marketing Order until 1957, and indeed there was no federal regulation of the New York market until 1938. See 3 Fed.Reg.1945 (1938). The significant extension to New Jersey did not come until 1957.

38. Appellants both minimize the fear of such competition in view of the dealer concentration, citing MARKETING ECONOMICS DIV., U. S. DEP'T OF AGRICULTURE, NATURE OF COMPETITION IN FLUID MILK MARKETS (Agricultural Economic Rep. No. 67, 1965), and urge that in any event payments to avoid competition to handlers should come from handlers and not producers.

We note that the Secretary in opposing a stay and escrow of payments pendente lite, furnished an affidavit adverting to the decline in number of milk producers, and particularly nearby producers.

39. Appellants have a sufficient proprietary interest in the settlement fund to confer standing to complain of unauthorized diversions. They sought an order requiring escrow of payments pendente lite.

40. "It is a familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies, may be affected by the public interest involved." United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

an invalid nearby differential, but also contained a significant geographical expansion of the market encompassed by the regulation.

 Although the invalid nearby differential provision dates in its present form from 1957, no challenge was made to it until 1965. All but one of the appellants belonged to a producers' cooperative association which resisted this differential in 1957. Yet they waited eight years before filing this action. This is not laches barring all relief, but it certainly affects the relief that may be claimed by appellants.

We reverse the judgment with directions to fashion a decree that will grant the relief prayed in the complaint, namely declaration of the invalidity of § 1002.71 (b), and injunction against its future enforcement. Our judgment and opinion are not intended to afford any basis for recovery by appellants or their class based on past payments.

It is so ordered.