**Robert L. SMYSER, et al., Plaintiffs,**

v.

**John R. BLOCK, et al., Defendants.**

Civ. A. No. 83–0546.

United States District Court,
M.D. Pennsylvania.

Feb. 27, 1984.

Marvin E. Beshore, Beshore & Bickley, Harrisburg, Pa., for plaintiffs.

Donald F. Copeland, Speese, Bongiovanni & Copeland, Philadelphia, Pa., for defendants-intervenors Inter-State Milk Producers, et al.

John Sherlock, III, Barnett & Alagia, Washington, D.C., David C. Shipman, Asst. U.S. Atty., Harrisburg, Pa., D. Paul Alagia, Jr., Hugh Scott, Richard A. Gladstone, John M. Himmelberg, Barnett & Alagia, Garrett B. Stevens, John Chernauskas, Alexandria Maravel, U.S. Dept. of Agr., Washington, D.C., for Dairymen, Inc. defendant-intervenor.

## MEMORANDUM

CALDWELL, District Judge.

The instant action has been brought by plaintiff dairy farmers to challenge the validity of two amendments to the Secretary of Agriculture's order regulating the handling of milk in the Middle Atlantic Marketing Area (7 C.F.R. § 1004.1, *et seq.*). Plaintiffs commenced the action by complaint and motion for a preliminary injunction filed April 27, 1983. The motion for preliminary relief was resolved by stipulation at a hearing held May 11, 1983. The parties have undertaken discovery and now before the court are motions for summary judgment filed by the plaintiffs, defendant John R. Block and the United States Department of Agriculture, as well as defendant-intervenors Dairymen, Inc., and Pennmarva Dairymen's Federation, Inc. These matters are now ripe for our decision.

Milk is generally produced by individual dairy farmers (producers) who sell their milk either individually or through cooperatives to a milk processor or handler for transportation to a processing plant. The marketing of milk by producers and handlers is carefully controlled by statute, regulations, and order. The Agricultural Adjustment Act, at 7 U.S.C. § 608c empowers the Secretary of Agriculture to issue orders regulating the handling of certain agricultural commodities. At 7 U.S.C. § 608c(5) the Act states that

In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others.

The subsection goes on to provide, in part pertinent to this lawsuit

(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, (d) a further adjustment to encourage seasonal adjustments in the production of milk through equitable apportionment of the total value of the milk purchased by any handler, or by all handlers, among producers on the basis of their marketings of milk during a representative period of time, which need not be limited to one year; (e) a provision providing for the accumulation and disbursement of a fund to encourage sea-

sonal adjustments in the production of milk may be included in an order; and (f) a further adjustment, equitably to apportion the total value of milk purchased by all handlers among producers on the basis of their marketings of milk, which may be adjusted to reflect the utilization of producer milk by all handlers in any use classification or classifications, during a representative period of one to three years, which will be automatically updated each year. In the event a producer holding a base allocated under this clause (f) shall reduce his marketings, such reduction shall not adversely affect his history of production and marketing for the determination of future bases, or future updating of bases, except that an order may provide that, if a producer reduces his marketings below his base allocation in any one or more use classifications designated in the order, the amount of any such reduction shall be taken into account in determining future bases, or future updating of bases. Bases allocated to producers under this clause (f) may be transferable under an order on such terms and conditions, including those which will prevent bases taking on an unreasonable value, as are prescribed in the order by the Secretary of Agriculture. Provisions shall be made in the order for the allocation of bases under this clause (f)—(i) for the alleviation of hardship and inequity among producers;

Pursuant to the authority granted by statute, the Secretary of Agriculture promulgated orders governing the handling of milk in various regions of the United States. The effect of these orders is to create "pooling" of milk producers with a market administrator to enforce the provisions of the order. For example, milk which is used for fluid consumption (Class I milk) commands a higher price than milk of identical quality which is used for butter and cheese (Class II and III milk). Pursuant to the act just quoted, handlers must pay uniform prices depending on the class of milk purchased (depending on the use to which the milk is put) *See* 7 U.S.C. § 608c(5)(A). Producers on the other hand receive a uniform or "blend" price for their milk regardless of the use to which it is ultimately put. *See* 7 U.S.C. § 608c(5)(B)ii. The producer blend price is based on the average value of all milk in the market. The minimum prices to handlers must also be uniform (subject only to authorized differentials) with respect to the use to which the milk is put. The Market Administrator requires all handlers to account for the use value of their milk purchases to him and to pay the blend prices to the producers or cooperatives selling to the handler. The administrator acts as trustee of a "producer-settlement fund," requiring handlers whose average use value is higher than the market average to pay into the fund, while allowing handlers with lower averages to draw from the fund in order to have sufficient funds to pay their producers the "blend" price.

The problem which the challenged action by the Secretary attempted to address was brought about by the convergence of a nationwide trend and a seasonal event peculiar to the dairy industry. In recent years, there has been a trend toward an increase in milk production relative to demand. This, apparently, has led to the closing of a number of milk plants in the Middle Atlantic milk pooling area. The seasonal event is the springtime "freshening" of dairy cows which results in a period of increased milk production known as the "spring flush." Defendant-intervenors and others feared that the coincidence of these two factors would result in serious disruption in the milk market in the Spring of 1982 possibly causing producers to dump quantities of Class II and Class III milk which they would be unable to sell to handlers. The idea was that handlers would be unable to find a market for the milk at a pool plant within the marketing region, and would refuse to purchase because of the costs involved in transporting the milk to a distant plant.

Defendant-intervenors advised the Secretary of Agriculture of their concerns, and hearings were held to consider the advisa-

bility of an amendment to the milk marketing order which would address the concerns voiced. The first hearing was held on March 16 and 17, 1982 and an emergency decision was thereafter published on May 10, 1982, effective May 21—June 30, 1982. The following year, a hearing on the same issue was held on March 1, 1983. An emergency decision was published on April 5, 1983, effective April 15—June 30, 1983.

The amendments adopted in 1983 were identical to those in 1982 and added a new section to 7 C.F.R. § 1004.60 providing that the market administrator shall

(f) With respect to milk marketed on and after the effective date hereof through June, 1982, subtract the amount obtained by multiplying the pounds of bulk fluid milk products that were transferred or diverted from a pool plant to a nonpool plant and classified as Class II milk pursuant to § 1004.42(d) or § 1004.42(e)(3) by a rate for each truckload of milk so moved that is equal to 3.6 cents per hundredweight for each 10 miles or fraction thereof that the nonpool plant is located more than 200 miles (as determined by the market administrator) from the nearest of the following locations: the city hall in Philadelphia, Pennsylvania; the zero milestone in Washington, D.C.; the city hall in Baltimore, Maryland; the transferor plant; or, for diversions, the pool plant of last receipt for the major portion of milk on the load or the courthouse of the county where the major portion of the milk so diverted was produced. No credit shall apply to the total quantity of milk so moved to a given nonpool plant by a handler during the month if any portion of the milk is assigned to Class I.

It is this amendment to the milk marketing order to which plaintiffs object. Plaintiffs' challenges are readily divisible into three major areas: 1) The transportation credits are not authorized by the Agricultural Marketing Agreement Act, 2) the procedures used in promulgating the amendment were violative of the requirements of the Administrative Procedure Act and the Rules of Procedure of the Department of Agriculture, and 3) that the Secretary abused his discretion by failing to consider available alternatives and by basing his decision on findings not supported by substantial evidence.

█ We first address the question of whether the transportation credits are authorized by the Agricultural Marketing Agreement Act. The Act provides that

In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others.

7 U.S.C. § 608c(5). Subsection 7 provides, in pertinent part

In the case of the agricultural commodities and the products thereof specified in subsection (2) of this section orders shall contain one or more of the following terms and conditions: ....

(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5) to (7) of this section and necessary to effectuate the other provisions of such order.

Defendants contend that the amendments to the milk marketing order were necessary to maintain the effectiveness and utility of the milk marketing pool. Plaintiffs deny that this is so, and argue that the amendments to the order are inconsistent with 7 U.S.C. § 208c(5) in that they

(1) violate handler price uniformity under § 608c(5)(A); (2) violate producer price uniformity under § 608c(5)(B); (3) violate the "irrespective of end use" requirement of § 608c(5)(B)(ii); (4) establish a surplus pricing scheme inconsistent with § 608c(5)(B)(d)(f); and (5) classify milk on the impermissible basis of distance moved.

We begin our analysis by parsing the authorization of § 608c(7)(D). The first requirement is that the terms of an order be "incidental to" the terms and conditions specified in subsections (5) to (7) of the section and "necessary to effectuate the

other provisions of such order." Plaintiffs contend that this additional grant of authority should be read narrowly to authorize provisions necessary to effectuate other provisions of an order rather than its purpose. Thus, the finding of the Secretary that the amendments would serve as "additional mechanisms" to effectuate the "purposes of Act or order provisions" is inadequate. Further, plaintiffs argue, because the transportation credits attempt to pool *costs* and not milk use values, they do not effectuate marketwide pooling of use values of milk.

In approving the amendments, the Secretary found that

> [T]he cost impact of handling surplus milk normally falls largely on members of cooperatives, [but] nonmember producers are not necessarily immune to adverse impacts of the heavy supply situation. Proprietary handlers who do their own balancing may experience difficulties in disposing of the excess milk supplies of their independent producers. Any long-distance milk shipments must be borne by the handlers since they are required to pay producers minimum Class III (or Class II) price for the milk. Their alternative is to refuse to accept all the milk produced by these dairy farmers. If the latter situation occurred, the impact would fall entirely on those dairy farmers. Any widespread occurrence of this situation could lead to disorderly marketing conditions.

> \*      \*      \*      \*      \*      \*

> The authority for [the transportation credits] is section 608c(7)(D) of the Act, which provides that an order may contain terms and conditions incidental to, and not inconsistent with, other provisions of the Act if such terms and conditions are necessary to effectuate the other provisions of the order.

> One of the underlying purposes of the Act is to establish orderly marketing conditions for dairy farmers. The Act authorizes a number of specific means for achieving this, including the pooling of milk on a marketwide basis. Through this pooling procedure, all producers in the market share equitably in both the market's higher-valued fluid sales and their reserve milk supplies that necessarily must be available in the fluid market but which return only the lower manufacturing value. History has demonstrated that in the absence of marketwide pooling the burden of the lower-valued reserved supplies falls unevenly on various groups of producers. This tends to result in various disorderly conditions in the market that are harmful not only to producers but to handlers and consumers as well. Producers have found it in their long-run interest to share uniformly in the burden of the reserve milk supplies.

> The pool credits adopted herein are an extension of this marketwide sharing concept. As already described, unusual supply-demand conditions are resulting in certain producers bearing an inequitable share of the costs of handling excess milk supplies associated with the fluid markets. The pool credits represent a reasonable means of maintaining orderly marketing conditions for producers.

It is certainly not disputed that the marketwide pooling of milk is authorized by the AMAA. Nor, apparently, is it disputed that both the Act and the milk marketing pool have as their object the orderly marketing of milk:

> The plain thrust of the federal statute was to remove ruinous and self-defeating competition among the producers and permit all farmers to share the benefits of fluid milk profits according to the value of goods produced and services rendered.

*Zuber v. Allen,* 396 U.S. 168, 180–81, 90 S.Ct. 314, 321, 24 L.Ed.2d 345, 353 (1969). Given the recognized purposes of the statute and the order, together with the findings of the Secretary in this case, we believe it can be fairly said that the transfer credits are at least "incidental to" the terms and conditions of 7 U.S.C. § 608c(5)–(7) and "necessary to effectuate the other provisions" of the milk marketing order.

In drawing this conclusion, we construe the phrase "other provisions" more broadly than plaintiffs, who seemingly read the phrase "*any* other provision(s)." Rather, we believe "the other provisions" can more logically be read to refer to the provisions as a whole or the order in total. In finding that the transportation credits were warranted to preserve the orderly marketing of milk in the area, we believe the secretary thus concluded in accordance with the statute that the credits were necessary to effectuate the other provisions of his milk marketing order. Thus, the amendments implemented are authorized by the AMAA so long as they are not inconsistent with the statutory terms and conditions specified at 7 U.S.C. § 608c(5)–(7).

■ We do not agree with the plaintiff that the transportation credits violate the classification and uniform pricing scheme outlined in the AMAA. To recapitulate briefly, the Act requires that, subject to certain listed adjustments, handlers be paid a uniform price for milk depending upon its use classification and that producers receive a uniform, blended price for all milk purchased by a handler, regardless of the end use to which the milk is put.

We begin by noting that the status of cooperative associations as handlers has been recognized as distinct from their role as an association of individual producers. *See United States v. Rock Royal Cooperative,* 307 U.S. 533, 554, 579, 59 S.Ct. 993, 1004, 1015, 83 L.Ed. 1446, 1460, 1473 (1939). Inasmuch as the transportation credits are available to handlers only, they have no effect on the blend prices paid to individual producers. Nor do the credits, from the point of view of the handler, amount to a reclassification of milk based on impermissible criteria. To the contrary, milk is still categorized according to its end use. The credit is available only for milk actually transported long distances off the market, is based upon the distance moved, and, the testimony suggests, is no more than sufficient to defray the costs of transportation. These facts, we believe, distinguish the present case from those relied upon by the plaintiffs, each of which bears

a superficial resemblance to the case now before us. In the case of *Brannan v. Stark,* 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1951), for example, an amendment to a milk marketing order would have authorized special payments to cooperative associations "as remuneration for services performed for the market by the association." *Id.* at 458, 72 S.Ct. at 437. These payments were to be funded by deductions from prices paid all producers. In *Brannan,* the Court found that many of the activities which qualified the cooperatives for the payments were principally for the benefit of the members of the cooperative rather than for the market as a whole:

> Other services of the cooperatives which are claimed to be beneficial to all producers are, as they affect the issue here, relatively insignificant. These activities are, like the others, primarily designed for the advantage of members, although they may sometimes incidentally benefit the whole market. They generally amount to no more than playing the part of an alert, intelligent, organized participant in the market. They include such functions as employing economists to study the needs of the industry, participating in hearings on orders such as that involved here, being attentive to changing factors in the market, and maintaining the cooperative organizations by promotional work to show farmers the benefits of cooperation and by educational work among members. One may observe some incongruity in requiring some producers to pay others for vigorously prosecuting their own interests, especially where their interests may sometimes conflict with those of the producers burdened with the payments. In these circumstances we cannot say that the disputed provisions fall within the authority granted by the catchall phrases of § 8c(7)(D) of the Act.

*Id.* at 462, 72 S.Ct. at 439. *See also Zuber v. Allen,* 395 U.S. 168, 184, n. 18, 90 S.Ct. 314, 323, n. 18, 24 L.Ed.2d 345 (1969). In the present case, transportation credits are available not only to cooperative associa-

tions in their capacity as handlers, but to non-cooperative handlers as well. Further, the credits are available only upon the performance by a handler of a service which the Secretary has found valuable to the orderly marketing of milk in the area.

For similar reason, the cases of *Blair v. Freeman*, 370 F.2d 229 (D.C.Cir.1966), and *Inter-State Milk Producers Cooperative v. Butz*, 372 F.Supp. 1010 (E.D.Pa.1974) are distinguishable. In *Blair*, for example, the Secretary implemented a system of "nearby differentials" allowing for additional payments *to producers*, based on the proximity of their farms to New York City:

> In the ultimate, therefore, the nearby differential was designed by the Secretary to compensate nearby producers for the reduction in their share of the fluid milk market resulting from their inclusion in the blended uniform price system. The findings underlying this approach were that historically a disproportionately significant segment of the premium-priced market for fluid milk had been captured by producers located nearest to the core of the New York metropolitan area, and thus by participating in the pool these producers were surrendering a very real economic advantage.

370 F.2d at 236–37. The court found that the adjustment was invalid:

> That the nearby differential adjustment turns on prohibited considerations of fluid milk use appears not only from the fact that eligibility for payments depends on farm location, but also from the fact that payments vary (inversely) with the extent of fluid milk utilization. The differential is sensitively attuned to the supposed special place of the nearby producer in the fluid milk market, and is taken away when fluid milk utilization is so high marketwide that he merits no premium based on that special place.
>
> The reason for the differential was to compensate the eligible farmers for the loss of their special share of the fluid milk market. Such a consideration is not affirmatively authorized by this statute which precisely circumscribes the power

of the Secretary of Agriculture. On the contrary, this is exactly the approach the Congress intended to prohibit.

*Id.* at 238. In *Inter-State Milk Producers Cooperative, supra,* the court invalidated an order which reclassified as Class I any fluid milk which was transferred to a non-pool plant located more than 300 miles from city hall in Baltimore. The new classification was conclusive irrespective of use and had the effect of significantly increasing the plaintiff handler's liability to the producer's settlement fund. The court observed that

> The Secretary is given extremely wide latitude as to what use is used for the basis of classification. However, we fail to see how a distance of 300 miles has any bearing on use.... The real purpose for setting any such distance is ease of administration.... We see no justifiable reason for a conclusive presumption of Class I use once milk is moved over 300 miles.... The effect of the relevant provisions of Order No. 16 appears inescapable; that is, that the controlling criteria for classifying petitioner's milk was the distance which it moved. Ease of administration is certainly a factor to be considered in reviewing the Secretary's implementation of § 8c of the Act, but it cannot serve as the only basis upon which to classify milk.

372 F.Supp. at 1014.

The provisions before us represent neither a marketing incentive bonus for producers based on the location of their farms, as in *Blair*, nor a reclassification of milk use, for administrative convenience as in *Inter-State Milk*, based solely on the distance transported. The transportation credits here do not accrue to the benefit of producers nor do they amount to a reclassification of milk. Instead, they operate independent of the classification scheme to respond to a specific problem by partially defraying the expense incurred by handlers in transporting milk to distant markets. The amount of the credit is based on the distance actually transported. We cannot say that the provisions here challenged are

1404

inconsistent with the AMAA or the judicial decisions interpreting it. We find, therefore, that the Secretary acted within his authority in promulgating the amendments in issue.

We are left to determine whether the Secretary's decision is supported by substantial evidence and whether the procedures used in the rulemaking were legal. Our role in reviewing the factual basis of the Secretary's decision is succinctly summarized by the court in *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308 (3d Cir.1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969):

> The power of the District Court in reviewing the decision of the Secretary, following his adjudicatory hearing, is not a *de novo* fact finding process. It is limited to a determination whether the rulings of the Secretary are in accordance with law and his findings are supported by substantial evidence. If they are, they may not be disturbed. Because there attaches to the determination of an administrative agency a presumption of the existence of facts justifying the determination, the burden of proof falls on the party challenging the validity of the agency's ruling.

*Id.* at 315–16. We might add that deference to the administrative decision has been particularly great in the area of the milk law:

> A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority.

*Blair v. Freeman*, 370 F.2d at 232. We do not intend to restate the record in detail. After review, however, we believe that there is evidence of record sufficient to support the Secretary's conclusions. There was ample testimony, for example, to support the conclusion that the Spring flush in 1982 would result in an increased milk volume of millions of pounds (See R. 164–67,

255, 1982 hearing). There was also testimony throughout the hearings of the burden of clearing the market of surplus milk which, absent the transportation credits, would have to be carried by the handlers. It was posited that the handlers' response to this burden could lead to disorderly marketing conditions. Naturally, some of the evidence presented can be characterized as speculative, since it concerns the predicted impact on the milk market of projected events. Under the circumstances, this does not render the evidence insufficient. We further find that the Secretary did not act arbitrarily or capriciously in refusing to consider other available alternatives to address the problem. Consider other available alternatives to address the problem. The record and the decision itself reveal that other alternatives were explored, but were rejected in favor of the transportation credits at issue, which were deemed the only wholly satisfactory alternative.

There was also evidence to suggest that an emergency situation existed so as to justify the expedited rulemaking procedures utilized by the Secretary. These procedures are authorized by the Administrative Procedure Act and by the Department of Agriculture's own procedural rules. Various witnesses testified that they considered the Spring flush of 1982 an emergency situation and they offered their reasons for this observation. There was also testimony that all the data were not in to confirm these fears until shortly before the hearing in March of 1982. We are somewhat concerned that the emergency procedures were also employed to expedite the 1983 rulemaking. Although it is probably true that all data to confirm the extent of the problem addressed by the 1983 amendments would not be available until shortly before the hearing, it would seem that the extensive hearings on the identical issue in 1982 would have alerted everyone sufficiently to the potential problem so as to make expedited procedures unnecessary. Still, plaintiffs were represented at all proceedings, they now offer arguments in opposing the amendments very similar to

those offered before the Secretary and, in short, have demonstrated no prejudice to them resulting from the abbreviated procedures. Such a showing of prejudice is normally required before rulemaking procedures will be invalidated. *See American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547, 553 (1970). If the Secretary erred procedurally, his error was harmless and thus affords no basis for reversing his decision. *See McCulloch Interstate Gas Corp. v. F.P.C.,* 536 F.2d 910 (10th Cir. 1976); *Greater Boston Television Corp. v. F.C.C.,* 444 F.2d 841 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

An appropriate order will be entered.

### ORDER & JUDGMENT

AND NOW, this 27th day of February, 1984, plaintiffs' motion for summary judgment is DENIED and the motion for summary judgment of defendant and defendant-intervenors is GRANTED. Judgment is accordingly hereby entered in favor of defendants and defendant-intervenors and against the plaintiffs.